HELEN M. WEBB, ALLEGED TRANSFEREE, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 7004–74, 7012–74, 7056–74.    Filed November 23, 1976.

---

[5] See n. 2 on p. 288 of this opinion.

[1] The following cases are consolidated herewith: Charles M. Webb, alleged transferee, docket No. 7012–74; William C. Webb, alleged transferee, docket No. 7056–74.

*Kenneth G. Anderson, Robert S. Bolt,* and *Laurie W. Tomlinson,* for the petitioners.
*Robert S. Shilliday, Jr.,* for the respondent.

FEATHERSTON, *Judge:* Pursuant to section 6901,[2] respondent has determined that petitioners are liable as transferees for a deficiency of $216,161.48 in the 1967 Federal income tax of the Cecil M. Webb Holding Co., which was liquidated in 1971. The amounts of the transferee liabilities so determined in respect of each of the petitioners are as follows:

| | |
|---|---|
| Helen M. Webb | $216,161.48 |
| Charles M. Webb | 202,158.89 |
| William C. Webb | 205,763.57 |

The following issues have been presented for decision:

(1) Whether the proceeds of the sale of a parent corporation's stock to a subsidiary corporation, which were received by one of the parent's shareholders, are taxable to the parent as a dividend under section 304(a)(2), as supplemented by section 304(b)(2)(B).

(2) If issue 1 is answered affirmatively, whether the parent corporation's failure to report such dividend as income was an omission of a sum in excess of 25 percent of the gross income reported in its 1967 income tax return within the meaning of section 6501(e), the 6-year statute of limitations on assessments.

---

[2] All section references are to the Internal Revenue Code of 1954, as in effect during the tax year in issue, unless otherwise noted.

(3) If issue 1 is answered affirmatively, whether the parent corporation's receipt of that dividend caused the parent corporation to become a personal holding company under section 542(a) and hence subject to the personal holding company tax imposed by section 541.

(4) If issues 1 and 3 are answered affirmatively, whether the parent corporation, in computing its personal holding company tax, is allowed a dividends-paid deduction under sections 561 and 562 for the amounts received by the shareholder selling a portion of its stock in the parent corporation.

(5) Whether respondent has carried his burden of showing that petitioners are liable as transferees for any deficiencies owed by the parent corporation for 1967, depending upon our decision of the issues above.

### FINDINGS OF FACT

On May 21, 1974, respondent mailed a notice of liability to each of the petitioners, in which he determined that each was liable as a transferee of the assets of Cecil M. Webb Holding Co. (hereinafter Webb Co. or sometimes the parent corporation). The three petitioners, Helen M. Webb, Charles M. Webb, and William C. Webb, were legal residents of Tampa, Williston, and Chipley, Fla., respectively, at the time they filed their petitions with this Court.

Cecil M. Webb (Cecil) died on February 4, 1965, leaving his two sons, Charles M. Webb (Charles) and William C. Webb (William), and his widow, who subsequently remarried and is now Helen M. Frazier (Helen). Helen was Cecil's second wife and the stepmother of Charles and William. There were no children born of the marriage of Cecil and Helen.

During his lifetime Cecil organized or acquired a group of corporations known as the Dixie Lily group. The corporations, located in Georgia and Florida, were engaged primarily in the manufacturing, packaging, and wholesale distribution of food products under the tradename "Dixie Lily." The principal corporations of the Dixie Lily group were as follows:

Kinchafoonee Milling Co., Inc. (Kinchafoonee)
Tampa, Fla.

Dixie Lily Milling Co., Inc. (Dixie Lily)
Williston, Fla.

Dixie Lily Milling Co. of West Florida, Inc. (West Florida)
Chipley, Fla.

Phillips Milling Co., Inc. (Phillips)
Tifton, Ga.

In addition, Kinchafoonee and Dixie Lily controlled several subsidiary companies, including Dixie Lily Milling Co. of North Florida, Inc. (North Florida), which were engaged in the distribution of Dixie Lily products and related businesses.

Prior to the creation of Webb Co., Cecil was the majority shareholder of Kinchafoonee and Dixie Lily. Although he did not own controlling interests in the other Dixie Lily group companies, Cecil was the dominant executive officer of the corporate group. Helen was employed by Kinchafoonee and owned stock in that company as well as in Dixie Lily. Charles and William were officers and shareholders of the Dixie Lily group and were primarily involved in the activities of Phillips and West Florida, respectively.

On July 26, 1963, Cecil caused Webb Co. to be formed. Under the corporate articles, two classes of stock were authorized—class A voting stock with 500 authorized shares and class B nonvoting stock with 2 million authorized shares.

When Webb Co. was formed, the stock of the principal companies in the Dixie Lily group was held as follows:

| Stockholder | Kinchafoonee | Dixie Lily | West Florida | Phillips |
|---|---|---|---|---|
| Cecil | 180 | 172 | 50.0 | 0 |
| Helen | 100 | 88 | 0 | 0 |
| Charles | 35 | 25 | 33.5 | 58 |
| William | 35 | 25 | 51.5 | 52 |
| Dixie Lily | 0 | 0 | 0 | 50 |
| North Florida | 0 | 0 | 0 | 50 |
| | 350 | 310 | 135.0 | 210 |

Cecil transferred all of his stock in the Dixie Lily group to Webb Co. in exchange for the 500 class A voting shares and 1,904,000 of the class B nonvoting shares. Charles and William exchanged a portion of their holdings in Phillips and West Florida for shares of class B Webb Co. stock. The following is a summary of the transfer of Dixie Lily group stock to Webb Co.:

| Stockholder | Dixie Lily group shares transferred | Webb Co. shares received |
|---|---|---|
| Cecil | 172 Dixie Lily | 500 class A |
| | 180 Kinchafoonee | and |
| | 50 West Florida | 1,904,000 class B |
| Charles | 6 Phillips | 4,861 class B |
| William | 18 West Florida | 10,082 class B |
| Dixie Lily | 50 Phillips | 40,509 class B |
| North Florida | 50 Phillips | 40,509 class B |

At all times relevant to this proceeding and after the transfer of the Dixie Lily group stock to Webb Co., the parent corporation owned the following percentages of the total combined voting power of the companies in the corporate group:

| Company | Percentage of ownership | Company | Percentage of ownership |
|---|---|---|---|
| Kinchafoonee | 51.43 | West Florida | 50.37 |
| Dixie Lily | 55.48 | Phillips | 50.48 |

On August 19, 1963, Cecil, as grantor, executed a trust agreement, transferring into the trust his 500 class A voting shares of Webb Co. The beneficiaries of the trust included petitioners as well as the children of Charles and William. The trust was to terminate upon the death of the last surviving of the petitioners. Petitioners and two business associates of Cecil's served as trustees.

After its formation Webb Co.'s essential business function was to consolidate and to vote its majority stockholdings in the Dixie Lily group corporations and, along with the trust, to serve as a management entity to control, unify, and coordinate the operations of the Dixie Lily group.

Shortly after Cecil's death on February 4, 1965, his will was admitted to probate and letters testamentary were issued to the First National Bank of Tampa, Fla., as executor of the estate. The stock ownership of Webb Co. did not change from the time of its formation until Cecil's death. On the Federal estate tax return, Cecil's estate included in the determination of the gross estate for Federal estate tax purposes 1,904,000 class B Webb Co. shares and the 500 class A Webb Co. shares held in trust. The value of the Webb Co. stock constituted more than 35 percent of Cecil's gross estate and more than 50 percent of his taxable estate. Helen, Charles, and William were named as beneficiaries in Cecil's will.

On December 7, 1967, Cecil's estate sold 515,900 shares of Webb Co. class B nonvoting stock to Kinchafoonee, one of the principal companies in the Dixie Lily group. The estate received $288,904 in cash on the sale. This amount did not exceed the amount of Cecil's funeral and administration expenses allowable as deductions to the estate under section 2053 and the sum of the estate, inheritance, legacy, and succession taxes imposed because of his death. Because of the application of sections 303 and 1014, no gain to the estate was recognized on the sale transaction. No other transaction involving Webb Co. stock occurred during the remainder of 1967, and except for the 515,900 shares sold to Kinchafoonee, the stock ownership of Webb Co. was unchanged after the sale.

On August 1, 1969, Webb Co., Helen, Charles, and William entered into an agreement with Nebraska Consolidated Mills Co. (hereinafter ConAgra), wherein all of their Dixie Lily group stock was to be exchanged for 122,154 shares of ConAgra. Pursuant to the reorganization plan, Webb Co. redeemed its stock held by Kinchafoonee, Dixie Lily, and North Florida for 22,154 shares of ConAgra stock and retired the shares received in redemption. Respondent had determined that the transaction qualified as a reorganization within the meaning of section 368 and that no gain on the exchange was to be recognized by Webb Co. or petitioners.

On July 2, 1971, Webb Co.'s board of directors voted to dissolve and liquidate the company completely. On August 3, 1971, after the liquidation, the respective shareholdings in Webb Co. were as follows:

| Class A | Shares |
|---|---|
| Webb Trust | 500 |
| Class B | Shares |
| Helen | 812,179.96 |
| Charles | 292,821.02 |
| William | 298,042.02 |
| Total class B stock outstanding | 1,403,043.00 |

Upon Webb Co.'s dissolution, its assets were distributed to the shareholders of Webb Co. in proportion to their respective stockholdings as follows:

| Stockholder | Cash | Shares of ConAgra | Escrowed ConAgra shares |
|---|---|---|---|
| Helen | $703.33 | 27,867 | 5,818 |
| Charles | 248.26 | 10,047 | 2,098 |
| William | 261.94 | 10,226 | 2,135 |
| Webb Trust | 353.27 | 0 | 0 |
| | 1,566.80 | 48,140 | 10,051 |

From the time of its formation until its dissolution in 1971, Webb Co. reported no taxable income. Although the companies in the Dixie Lily group were actively engaged in the milling and distribution business during this period, no dividends were formally declared to Webb Co.

Respondent determined that in the liquidation, Charles and William received assets totaling $202,158.89 and $205,763.57, respectively, and that the extent of their individual liabilities is limited to those amounts. Respondent also determined that in the liquidation, Helen received assets exceeding Webb Co.'s determined deficiency and that she is liable as transferee for the full amount of such deficiency.

OPINION

Restated concisely, the essential facts are that in 1967, the Webb estate owned most of the class B stock of Webb Co., which, in turn, owned 51.43 percent of Kinchafoonee's stock. The Webb estate sold about one-fourth of its class B stock in Webb Co. to Kinchafoonee for $288,904. Since this $288,904 did not exceed the taxes and expenses related to Cecil's death and administration of his estate, respondent agrees that section 303[3] protects the estate from any tax as a result of this

---

[3] SEC. 303. DISTRIBUTIONS IN REDEMPTION OF STOCK TO PAY DEATH TAXES.

(a) IN GENERAL.—A distribution of property to a shareholder by a corporation in redemption of part or all of the stock of such corporation which (for Federal estate tax purposes) is included in determining the gross estate of a decedent, to the extent that the amount of such distribution does not exceed the sum of—

(1) the estate, inheritance, legacy, and succession taxes (including any interest collected as a part of such taxes) imposed because of such decedent's death, and

(2) the amount of funeral and administration expenses allowable as deductions to the estate under section 2053 * * *,

shall be treated as a distribution in full payment in exchange for the stock so redeemed.

Since sec. 1014 gives an estate a basis in property equal to its fair market value as of the date of a decedent's death, the effect of sec. 303 is to permit a tax-free redemption of stock for the payment of death taxes and estate administration and related expenses.

transaction. But respondent maintains that the amount of the selling price of the stock was a dividend from Kinchafoonee to Webb Co. and that the following avalanche of tax consequences must fall on the subsequently liquidated Webb Co.[4] and, ultimately, on its former shareholders as transferees:

(1) An income tax (subject to the 85-percent intercorporate dividends-received deduction) on the $288,904 paid to the Webb estate by Kinchafoonee on the theory that the payment for the stock was a "constructive" dividend from Kinchafoonee to Webb Co.

(2) A 70-percent personal holding company tax of $201,303.23 on the theory that the alleged "constructive" dividend caused Webb Co. to become a personal holding company during 1967 and, even though the Webb estate received the full amount of the dividend distribution, Webb Co. is not entitled to a dividends-paid deduction because the distribution was not made proportionately among Webb Co.'s shareholders within the meaning of sections 561 and 562.

(3) Webb Co.'s failure to report the $288,904 as gross income in 1967 was an "omission" of a sum in excess of 25 percent of the gross income reported on its return for that year within the meaning of section 6501(e). The result is that the bar of the section 6501(a) 3-year limitation period is lifted for an assessment against Webb Co.

(4) Since petitioners received a portion of the proceeds of the subsequent liquidation of Webb Co., they are liable as transferees for the Webb Co. income and personal holding company taxes so determined.

---

[4] Respondent's position is based on Rev. Rul. 69-261, 1969-1 C.B. 94, involving a sale of a parent corporation's stock to a *wholly owned* subsidiary. Bittker & Eustice, Federal Income Taxation of Corporations and Shareholders, sec. 9.31, p. 9-39, n. 67 (3d ed.), describes that ruling as "a questionable interpretation of the statute." Ness & Vogel, Taxation of the Closely-Held Corporation, p. 10.52, n. 4 (1972), states: "It remains to be seen whether the courts will expand on the language of the Code in this way." Kahn, Basic Corporate Taxation 54 (1973), states: "The validity of that ruling is doubtful, since the apparent purpose of the provision in section 304(a)(2) is to measure the amount which is to be treated as a dividend to the transferor, and it is unlikely that Congress contemplated treating the constructive distribution to the parent as income to the parent." 1 Mertens, Law of Federal Taxation, sec. 9.106, p. 363 (1975), states: "This constructive dividend from the subsidiary to the parent appears to be only for the purpose of increasing the earnings and profits of the parent corporation and apparently is not an intercompany dividend to be included in the gross income of the parent corporation."

Respondent's determination depends upon whether Webb Co. realized a taxable dividend when the Webb estate sold its Webb Co. stock to Kinchafoonee for cash. The answer to this central issue turns on the meaning of section 304(a)(2) and (b)(2)(B). We think it quite evident that both the language and legislative history of these subsections clearly establish that the proceeds of the Webb estate's sale of the Webb Co. stock to Kinchafoonee were not a dividend to Webb Co., and we so hold.[5]

Section 304(a)(2) and (b)(2)(B) and its predecessor, 1939 Code section 115(g)(2), are the congressional response to *Rodman Wanamaker Trust*, 11 T.C. 365 (1948), affd. per curiam 178 F.2d 10 (3d Cir. 1949), where this Court held that a wholly owned subsidiary corporation's purchase of its parent's stock from shareholders of the parent did not result in a taxable dividend to the selling shareholders under 1939 Code section 115(g)(1) (the predecessor of current section 302). The problem to which 1939 Code section 115(g)(2), added to that Code in 1950, was addressed and the adopted solution were described as follows in H. Rept. No. 2319, to accompany H.R. 8920 (Pub. L. No. 814), 81st Cong., 2d Sess. (1950), 1950-2 C.B. 380, 420:

Section 115(g) of the Internal Revenue Code provides that where a corporation redeems its stock in such a manner as to make the redemption essentially equivalent to the distribution of a taxable dividend, the amount distributed in redemption of the stock shall be treated as a taxable dividend to the extent that it represents a distribution of earnings or profits. Such a provision was necessary to prevent stockholders from drawing off accumulated corporate profits through the device of selling part of their stock to the corporation.

The recent case of *Commissioner v. Wanamaker* (178 Fed. (2d) 10), however, has revealed a loophole through which this result can be accomplished without coming within the words of section 115(g). Section 115(g) was held in that case to be applicable only where a corporation cancels or redeems its own stock. It was held not to be applicable when a subsidiary corporation purchased the stock of its parent corporation from the shareholders of the parent, even though the effect was, in fact, identical with that which would have resulted if the parent had itself purchased the stock.

---

[5] Having reached this conclusion, we need not decide whether the alleged dividend constituted personal holding company income even though it was never actually received by Webb Co. and whether the payment entitles Webb Co. to a dividends-paid deduction under secs. 561 and 562.

If the stockholders of a corporation which owns all the stock of a subsidiary corporation obtain cash from that subsidiary, in effect they have received a dividend to the same extent as would be the case if the cash had been paid by the subsidiary to the parent corporation and had then been distributed by the parent to the stockholders. And where such stockholders "sell" part of their stock in the parent corporation to the subsidiary they nevertheless retain ownership and control of both corporations, since the "sold" stock is one of the assets which the parent corporation owns by virtue of its possession of all the stock of the subsidiary. Therefore, section 207 of your committee's bill amends section 115(g) of the Internal Revenue Code, so as to cover indirect redemption of shares in a parent corporation through purchases by its subsidiaries. * * *[6]

The language used in 1939 Code section 115(g)(2)[7] to close the loophole revealed in *Wanamaker* provided for treatment of the amount paid for the acquisition of the stock as a "taxable dividend *from* the issuing corporation" (emphasis added), i.e., from the parent corporation to its selling shareholder. Nothing in this language suggests that such amount was also to be treated as a dividend *to* the parent ("issuing") corporation. The "extent" of the dividend from the "issuing" corporation was the amount which would have been "essentially equivalent to a taxable dividend" if such amount had been distributed by the subsidiary ("acquiring") corporation to the parent and "had been applied by the issuing corporation in redemption of its stock." The language prescribing this procedure for measuring the extent of the

---

[6] Although this quotation refers to a parent corporation which owns all the stock of a subsidiary, the provisions of both 1939 Code sec. 115(g)(2) and 1954 Code sec. 304 are applicable where the parent corporation owns at least 50 percent of the total combined voting power of all classes of stock entitled to vote or at least 50 percent of the total value of shares of all classes of stock of the subsidiary corporation.

[7] SEC. 115. DISTRIBUTIONS BY CORPORATIONS.

(g) REDEMPTION OF STOCK.—

* * *

(2) REDEMPTION THROUGH USE OF SUBSIDIARY CORPORATION.—If stock of a corporation (hereinafter referred to as the issuing corporation) is acquired by another corporation (hereinafter referred to as the acquiring corporation) and the issuing corporation controls (directly or indirectly) the acquiring corporation, the amount paid for the acquisition of the stock shall constitute a taxable dividend from the issuing corporation to the extent that the amount paid for such stock would have been considered, under paragraph (1), as essentially equivalent to a taxable dividend if such amount had been distributed by the acquiring corporation to the issuing corporation and had been applied by the issuing corporation in redemption of its stock. * * *

dividend provided no basis for taxing the parent corporation with a dividend.

The substance of 1939 Code section 115(g)(2) was incorporated into the 1954 Code as section 304(a)(2),[8] which was supplemented by section 304(b)(2)(B).[9] See H. Rept. No. 1337, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. A79 (1954); S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 239 (1954). Again, the 1954 Code language does not purport to recharacterize the transaction as one in which the parent ("issuing") corporation receives a dividend. Rather, section 304(a)(2) provides that the "property" received in return for the stock "shall be treated as a distribution in redemption of the stock of the issuing corporation." This language obviously refers to a distribution *by* the parent corporation to the shareholder, not a distribution *to* the parent corporation. Such treatment of the property received by the parent corporation's shareholder in exchange for his stock provides no basis for taxing the parent corporation with a dividend from its subsidiary.

Thus, the technique adopted by Congress in closing the loophole is to treat the "property" received by the shareholder as a "distribution in redemption" of the parent corporation's stock. The distribution is then to be tested against the redemption provisions of sections 302 and 303 for the purpose of determining whether the transaction was, in substance, a redemption resulting in capital gain or a redemption to be

---

[8] SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.
(a) TREATMENT OF CERTAIN STOCK PURCHASES.—
  * * *
  (2) ACQUISITION BY SUBSIDIARY.—For purposes of sections 302 and 303, if—
    (A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and
    (B) the issuing corporation controls the acquiring corporation,
  then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.
[9] SEC. 304(b). SPECIAL RULES FOR APPLICATION OF SUBSECTION (a).—
  * * *
(2) AMOUNT CONSTITUTING DIVIDEND.—
  * * *
  (B) WHERE SUBSECTION (a)(2) APPLIES.—In the case of any acquisition of stock to which subsection (a)(2) of this section applies, the determination of the amount which is a dividend shall be made as if the property were distributed by the acquiring corporation to the issuing corporation and immediately thereafter distributed by the issuing corporation.

treated as a distribution to the selling shareholder resulting in dividend equivalency.

Evidencing this intent, the first words of the text of section 304(a)(2) are: "For purposes of sections 302 and 303." To qualify for taxation as capital gain, the sale proceeds, treated as a distribution in redemption of the stock, must meet one of the so-called "safe harbor" requirements of section 302(b) or constitute a redemption to pay death taxes qualifying under section 303. Only where the sale proceeds, so treated, meet one of those requirements is the amount of the selling price of the stock afforded capital gain treatment. Otherwise, that amount is treated as a distribution from the parent corporation to the selling shareholder, to which section 301 applies.[10] Where the capital gain requirements of section 302 or 303 are not met, section 304(b)(2)(B) comes into play to provide a means for determining the amount of the deemed section 301 distribution which constitutes a dividend. Section 304(b)(2)(B) states that the determination of "the amount which is a dividend" shall be made "as if" the property were distributed by the acquiring corporation to the parent ("issuing") corporation and immediately thereafter distributed by the parent corporation, thus providing the earnings and profits needed for dividend treatment.

Respondent focuses on the section 304(b)(2)(B) clause "as if the property were distributed by the acquiring corporation to the issuing corporation" and a statement in S. Rept. No. 1622, *supra* at 239, that "the proceeds of such sale shall be considered to be first a distribution by the subsidiary to the parent and then immediately thereafter a distribution by the parent corporation in redemption of its own stock." He argues that this language "requires the taxing of a dividend to the parent corporation and the parent corporation is subject to tax on this dividend income regardless of whether there is a dividend taxable at the shareholder level."

But respondent's argument takes the quoted words out of context and ignores both the legislative history and the

---

[10] Sec. 301, which deals with the manner in which corporate distributions are to be taxed, is brought into the picture by sec. 302(d), which provides, in substance, that a redemption which is *not* treated as a distribution in part or full payment in exchange for the redeemed stock shall be treated as a distribution of property by the corporation.

substantive thought conveyed by section 304(a)(2) and (b)(2)(B). The function of section 304(a)(2) and (b)(2)(B) is to insure that the redemption-distribution provisions of sections 301 through 303 are not circumvented by a sale of a parent's stock to a controlled subsidiary, nothing more. See H. Rept. No. 2319, *supra*, 1950–2 C.B. at 420. Under section 304(b)(2)(B), headed "Amount constituting dividend,"[11] the amount of the dividend to the selling shareholder is to be determined "as if" the subsidiary corporation had first distributed the stock's selling price to the parent corporation and the parent immediately distributed it to the shareholder. This provision is simply a mechanism by which earnings and profits of the parent corporation are adjusted for the purpose of *"the determination of the amount which is a dividend"* (emphasis added). It has nothing to do with the amount of the income of the parent corporation.

Section 1.304–3(a), Income Tax Regs., explaining section 304(a)(2) and (b)(2)(B), confirms that the "as if" language was intended to deal with the earnings and profits of the parent corporation where the "distribution" does not meet the capital gain requirements of section 302 or 303, as follows:

If a subsidiary acquires stock of its parent corporation from a shareholder of the parent corporation, the acquisition of such stock shall be treated as though the parent corporation had redeemed its own stock. * * * The determination whether the amount received shall be treated as an amount received in payment in exchange for the stock shall be made by applying section 303, or by applying section 302(b) with reference to the stock of the issuing parent corporation. *If such distribution would have been treated as a distribution of property* (pursuant to section 302(d)) *under section 301, the entire amount of the selling price of the stock shall be treated as a dividend to the seller to the extent of the earnings and profits of the parent corporation determined as if the distribution had been made to it of the property that the subsidiary exchanged for the stock.* * * * [Emphasis added.]

Respondent next urges that: "The statutory scheme of Code sections 301 through 304 supports the conclusion that the cash used to effectuate any redemption of a parent's stock by a subsidiary is constructively paid to the parent." Without

---

[11] The headings used in a statute are aids in ascertaining its meaning. *Maguire v. United States*, 313 U.S. 1, 9 (1941); *Knowlton v. Moore*, 178 U.S. 41, 65 (1900); *John Bell Keeble, Jr.*, 2 T.C. 1249, 1253 (1943). If sec. 304(a)(2) imposes a tax on the parent corporation, sec. 304(b)(2)(B) is superfluous because a dividend to the parent would automatically give the parent earnings and profits equal to the sale price.

this result, the argument goes, "there can be no 'redemption' of stock by a parent corporation where an entity other than the corporation which issued the stock purchases the stock."

But the Webb Co. stock purchased by Kinchafoonee was not actually redeemed as a result of the purchase. It became an asset of Kinchafoonee's and, as such, was subject to resale by Kinchafoonee and levy by Kinchafoonee's creditors. Like its other assets, the Webb Co. stock was held by Kinchafoonee, subject to the trust obligations of its directors to protect, preserve, and manage it for the benefit of all the shareholders, including the owners of Kinchafoonee stock (48.57 percent thereof) other than Webb Co.

As a result of Kinchafoonee's stock purchase, Webb Co.'s balance sheet was unchanged. Webb Co. retained the same assets, liabilities, and outstanding stock. Kinchafoonee's balance sheet was changed in only one respect: That company's cash was reduced by $288,904 and the Webb Co. stock was added to its other assets. Had Kinchafoonee immediately sold the Webb Co. stock for $288,904 in a separate transaction, Kinchafoonee's balance sheet would have been the same as before it acquired that stock. Indeed, the Internal Revenue Service has recognized that had Kinchafoonee sold the Webb Co. stock to outside interests in a separate transaction, such a transaction would have resulted in gain or loss to the subsidiary corporation (Kinchafoonee) measured by the excess or deficit of the selling price over the cost in acquiring the stock. Rev. Rul. 70–305, 1970–1 C.B. 169,[12] modified in other respects by Rev. Rul. 74–503, 1974–2 C.B. 117.

Section 304(a)(2) and (b)(2)(B) does not purport to convert the sale of a parent corporation's stock to a subsidiary corporation into an actual redemption of that stock. That section merely creates a series of fictions which are to be applied in order to close the loophole revealed by the *Wanamaker* opinion. Under that section the payment of the selling price is "t. eated" as a "distribution in redemption" of

---

[12] This revenue ruling does not expressly state that the cost to the subsidiary corporation should be used as the basis in computing gain or loss, but it supersedes S.M. 2205, III–2 C.B. 244 (1924), which does. The revenue ruling explains that "the position stated therein [S.M. 2205] is set forth under the current statute and regulations in this Revenue Ruling."

the parent corporation's stock. The stock is not actually redeemed but becomes an asset of the subsidiary corporation. The amount of the selling price of the stock is actually paid by the subsidiary corporation to the selling shareholders but is treated "as if" it were distributed to them by the parent corporation. And "the determination of the amount [if any, of such distribution] which is a dividend" to the selling shareholders is made "as if" the subsidiary corporation had distributed the amount of the selling price to its parent and the parent immediately thereafter distributed those proceeds to its selling shareholders, even though neither the subsidiary corporation nor the parent makes an actual distribution.[13] These fictions do not change the reality that the parent's stock is not actually redeemed.

Respondent casts his argument in the equity-oriented terms of a "constructive dividend," but Webb Co. received nothing which, in ordinary tax parlance, can be so characterized. No obligation undertaken by Webb Co. was discharged by Kinchafoonee, cf. *Shalk Chemical Co. v. Commissioner,* 304 F.2d 48, 50 (9th Cir. 1962), affg. 32 T.C. 879 (1959); *Edgar S. Idol,* 38 T.C. 444, 457–458 (1962), affd. 319 F.2d 647 (8th Cir. 1963), and no transfer of assets was made by Kinchafoonee for the benefit of Webb Co. or anyone else for an amount less than full consideration, cf. *Harry L. Epstein,* 53 T.C. 459, 474–475 (1969); *Challenge Manufacturing Co.,* 37 T.C. 650, 662–663 (1962). If Webb Co. realized any benefit whatever as a result of Kinchafoonee's purchase of the Webb Co. stock, that benefit was derivative in nature and was not a constructive dividend to Webb Co. Cf. *Sammons v. Commissioner,* 472 F.2d 449, 453

---

[13] A similar fiction is used in the parallel provisions of sec. 304(a)(1), which extend the redemption concept to the sale by one or more controlling shareholders of stock in one "brother-sister" corporation to another one. Under that section, property received by one or more persons who control each of two corporations is treated as a distribution in redemption of the stock of the corporation acquiring such stock. The stock so received is treated as a contribution to the capital of the corporation acquiring it. One court has said: "Just as the transaction is directed by statute to be 'treated' like a redemption when in fact the issuing corporation does not get its stock back, so this stock may be 'treated' as a capital contribution even though it does not come from an actual shareholder." *Coyle v. United States,* 415 F.2d 488, 491 (4th Cir. 1968). Under the heading "Amount constituting dividend," sec. 304(b)(2)(A) (corresponding with sec. 304(b)(2)(B)) provides that "the determination of the amount which is a dividend shall be made solely by reference to the earnings and profits of the acquiring corporation."

(5th Cir. 1972); *R. T. French Co.*, 60 T.C. 836, 855 (1973); *PPG Industries, Inc.*, 55 T.C. 928, 1002–1003 (1970); *Columbian Rope Co.*, 42 T.C. 800, 812–813 (1964); *Benjamin H. Freeman*, 41 T.C. 379, 385–386 (1963); *Milton F. Priester*, 38 T.C. 316, 327 (1962).

Indeed, adoption of respondent's position would frustrate the purposes of section 304 and related provisions. Where the capital gain requirements of sections 302 and 303 are not met and the parent has no other earnings and profits, respondent's position would permit the shareholders to receive most of the proceeds of the sale of their stock without incurring dividend taxation. Of the $288,904 received by the Webb estate, for example, imputed earnings and profits of some $220,000 would be consumed by Webb Co.'s taxes (income plus personal holding company taxes), leaving earnings and profits of only about $68,904 in Webb Co.'s hands. Thus, if neither section 302 nor 303 were applicable, the redeeming shareholders would receive the full $288,904 but would be taxed on dividend income of only approximately $68,904.[14] And the economic impact of the parent corporation's taxes on that dividend income would fall not on the shares treated as redeemed but on the remaining shares even though they had generated no economic benefit to their holders.[15] Such treatment is not consistent with the statutory scheme.

---

[14] *V. U. Young*, 5 T.C. 1251 (1945), relied upon by respondent and cited in Rev. Rul. 69–261, 1969–1 C.B. 94, involved a transaction engineered by the taxpayer-shareholder of a parent corporation which caused its subsidiary to distribute (through a bargain sale of) its assets directly to the taxpayer-shareholder's nominee. This Court held that the receipt of taxable income by the parent corporation could not be avoided through the device of shortcircuiting the parent corporation, i.e., causing the subsidiary corporation to make a distribution directly to the parent corporation's shareholder (actually such shareholder's nominee). See, e.g., *United States v. Joliet & Chicago R. Co.*, 315 U.S. 44 (1942). The *Young* case is distinguishable from the instant case where the Webb estate received from Kinchafoonee only the fair market value of the Webb Co. stock. Significantly, the *Young* case was decided prior to our decision in *Rodman Wanamaker Trust*, 11 T.C. 365 (1948), affd. per curiam 178 F.2d 10 (3d Cir. 1949), which precipitated the enactment of 1939 Code sec. 115(g)(2), and was not even cited in the *Wanamaker* opinion.

[15] Suppose S (subsidiary) has cash of $200,000, of which $100,000 is accumulated earnings and profits, and P's (parent) only asset is S's stock (worth $200,000). Estate A owns 55 shares (55 percent) of P's stock, with a value of $110,000, and B (unrelated) owns the other 45 shares (45 percent), with a value of $90,000. To pay estate taxes, etc., estate A sells 50 shares of P to S for $100,000, leaving S with only $100,000. Sec. 303 protects estate A from tax on the $100,000 it receives, and B now owns directly or indirectly 90 percent of P's stock. But under respondent's theory, P realized a dividend of $100,000, on which an income tax of about $7,500 and a personal holding

The case of *Union Bankers Insurance Co.*, 64 T.C. 807 (1975), which respondent cites, involved a substantially different factual situation and a different set of related statutes. In that case all the parties, the parent and subsidiary corporations as well as the redeeming shareholder, were corporations, and there was no determination of personal holding company tax liability. Nor was section 303 involved. The issue there presented required the meshing of section 304 with another set of directions in section 815 on how distributions to shareholders are to be charged in computing the phase III tax of life insurance companies. That case must be read in the context of the language and purposes of section 815. However, we shall no longer follow the reasoning of either *Union Bankers* or *Broadview Lumber Co. v. United States*, an unreported case (N.D. Ind. 1975, 36 AFTR 2d 75–6367, 75–2 USTC par. 9832), insofar as they hold that, in a situation described in section 304(a)(2) and (b)(2)(B), the "issuing" or parent corporation realizes a taxable dividend.

Since Webb Co. did not realize dividend income as a result of Kinchafoonee's stock purchase from the Webb estate, respondent has failed to show that Webb Co. omitted from its income tax return for 1967 a sum in excess of 25 percent of the reported gross income within the meaning of section 6501(e). The 3-year statute of limitations on assessments prescribed by section 6501(a) bars the determined income tax deficiency. Since Webb Co. received no dividend income from Kinchafoonee, Webb Co. was not a personal holding company in 1967. Accordingly, petitioners are not liable as transferees of Webb Co.

To reflect the disposition of certain issues which have been settled,

*Decisions will be entered under Rule 155.*
Reviewed by the Court.

---

company tax of approximately $65,000 would be due. When these taxes are paid, only $27,500 would be left in the two corporations. Of that amount, 95 percent or $26,125 would represent B's equity in the two corporations. Thus, under respondent's theory, B's equity is reduced from $90,000 to about $26,125 in a transaction from which he realized no benefit.

SCOTT, *J.*, dissenting: I respectfully disagree with the conclusion of the majority that where funds of a subsidiary corporation are used to acquire stock of its parent from its parent's stockholder the transaction is to be treated under section 304(a)(2) and (b)(2)(B) as a purchase of an asset by the subsidiary for all purposes except determining the amount, if any, of the dividend received by the stockholder of the parent corporation. In my view this holding ignores the intent of Congress in enacting the predecessor of section 304(a)(2) and (b)(2)(B) to close the "loophole" created by the decision in *Rodman Wanamaker Trust*, 11 T.C. 365 (1948), affd. per curiam 178 F.2d 10 (3d Cir. 1949). The holding of the majority also ignores the economic realities of the relationship between a parent and subsidiary where the stock of both is closely held and invites tax avoidance by a closely held parent corporation through use of its subsidiary's earnings for the benefit of the stockholder of the parent.

The *Wanamaker* case involved a "purchase" by a wholly owned subsidiary of its parent's stock from the sole stockholder of the parent. The case held that since the stock was neither canceled nor redeemed the subsidiary had merely made a purchase and acquired an asset. If, in economic reality, the subsidiary had acquired an asset, no loophole would have been created by our decision in the *Wanamaker* case. The loophole was created because the use of earnings of a subsidiary to make a so-called "purchase" of its parent's stock did not result in the subsidiary acquiring an asset but rather in the depletion of the subsidiary's earnings. This is the loophole that Congress was attempting to close. The intent of Congress is shown in the legislative history of the enactment of the statutes which are now section 304(a)(2) and (b)(2)(B) of the 1954 Code. The majority concentrates on a narrow interpretation of the *Wanamaker* case because of the limited issue involved in that case rather than on the remedy intended by Congress. The "loophole" was explained in the report of the House Ways and Means Committee as follows:

If the stockholders of a corporation which owns all the stock of a subsidiary corporation obtain cash from that subsidiary, in effect they have received a dividend to the same extent as would be the case if the cash had been paid by the subsidiary to the parent corporation and had then been distributed by the parent to the stockholders. And where such stockholders "sell" part of their stock in the parent corporation to the subsidiary they

nevertheless retain ownership and control of both corporations, since the *"sold" stock is one of the assets which the parent corporation owns by virtue of its possession of all the stock of the subsidiary.* \* \* \* [Emphasis added.]

H. Rept. No. 2319, to accompany H. R. 8920 (Pub. L. No. 814), 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 420.

In my view it is clear that Congress recognized that a susidiary in substance acquired no asset but in fact distributed its earnings when it purchased the stock of its parent corporation.

As more fully discussed in *Union Bankers Insurance Co.,* 64 T.C. 807, 815 (1975), section 304(a)(2) had its origin in section 115(g) of the 1939 Code. S. Rept. No. 2375, to accompany H. R. 8920 (Pub. L. No. 814), 81st Cong., 2d Sess. 82 (1950), specifically spells out the intent of the provisions as follows:

Under the amendment, where stock of a parent corporation is acquired by a subsidiary, the amount paid for the stock is treated, for the purposes of section 115(g)(1) *as` though such amount had been distributed by the subsidiary to the parent and had then been applied by the parent in redemption of its stock.* \* \* \* [Emphasis added.]

The bill, H. R. 8300 (which when enacted became the Internal Revenue Code of 1954), as passed by the House of Representatives proposed to have section 304, which incorporated the substance of section 115(g)(2) of the 1939 Code, provide that purchases of *its parent's stock by a subsidiary be* treated as if the purchasing company had redeemed its own stock directly from its shareholders. See H. Rept. No. 1337, to accompany H. R. 8300, 83d Cong., 2d Sess. A79 (1954). However, the Senate refused to accept such a provision and proposed changes which were ultimately enacted as section 304(a)(2). The Senate Finance Committee Report (S. Rept. No. 1622, to accompany H. R. 8300 (Pub. L. No. 591), 83d Cong., 2d Sess. 239 (1954)), explained section 304(a)(2) as changed by the Senate as follows:

The general rule of present law, preserved in the parent-subsidiary area, is set forth in paragraph (2). Under this rule, supplemented by subsection (b)(2)(B), if a subsidiary corporation purchases outstanding stock of its parent, the proceeds of such sale *shall be considered* to be first a distribution by the subsidiary to the parent and then immediately thereafter a distribution by the parent corporation in redemption of its own stock. [Emphasis added.]

The legislative history of section 304(a)(2) shows an intent by Congress to have the transaction treated as a use by the parent of the subsidiary's funds for redemption by the parent of the parent's stock. Section 304(a)(2)[1] does not limit the purposes for which the distribution "shall be treated as a distribution in redemption of the stock of the issuing corporation" except that this treatment shall be of "Certain Stock Purchases" for "purposes of sections 302 and 303." The instant case involves an application of section 303, which provides that a "distribution of property *to a shareholder by a corporation,*" the stock of which is included in a decedent's estate and which meets other standards, "shall be treated as a distribution in full payment in exchange for the stock so redeemed."

Property can be distributed "to a shareholder" only by a corporation in which the distributee *holds shares. Rodman Wanamaker Trust, supra.* Therefore, only the issuing corporation can make a distribution under section 303 to its shareholder. Only because of the provisions of section 304(a)(2) is the parent treated as having made such a distribution to the shareholder when the subsidiary purchases the stock of its parent from its parent's shareholders. Since the parent is treated as having made the distribution, it follows that the parent has used the subsidiary's funds for the distribution and has in substance and by law received a distribution from its subsidiary. Therefore, to the extent of the subsidiary's earnings and profits, the parent has received a dividend from its subsidiary. This is the holding of *Union Bankers Insurance Co., supra,* and *Broadview Lumber Co. v. United States,* an unreported case (N.D. Ind. 1975, 36 AFTR 2d 75-6367, 75-2 USTC par. 9832).

In concluding that there is no constructive dividend, the majority states:

---

[1] Sec. 304(a)(2) provides:

(2) ACQUISITION BY SUBSIDIARY.—For purposes of sections 302 and 303, if—

(A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and

(B) the issuing corporation controls the acquiring corporation,

then *such property shall be treated as a distribution in redemption of the stock of the issuing corporation.* [Emphasis added.]

No obligation undertaken by Webb Co. was discharged by Kinchafoonee, * * *, and no transfer of assets was made by Kinchafoonee for the benefit of Webb Co. or anyone else for an amount less than full consideration, * * *

This statement presupposes that section 304(a)(2) does not treat the purchase as a redemption by Webb Co. Since, under *Wanamaker,* only Webb Co. could redeem its own stock, section 304(a)(2) was enacted to cause a purchase by Webb's subsidiary to be treated as such a redemption. Therefore, under section 304(a)(2) a *statutory obligation* was placed on Webb Co. to redeem its stock if, in fact, it used a subsidiary's funds for the purchase of its stock. It was this statutory obligation of Webb Co. to redeem that was discharged by Kinchafoonee, thus in substance resulting in a distribution by Kinchafoonee to Webb Co. See *George R. Tollefsen,* 52 T.C. 671 (1969), affd. 431 F.2d 511 (2d Cir. 1970).

The cases cited by the majority in reaching its conclusion that Webb Co. received no "constructive" dividend are either distinguishable or upon close analysis support an opposite conclusion.

The ramifications of not treating section 304(a)(2) in accordance with the interpretation given it in the committee reports and in *Union Bankers* are serious.[2]

Under the holding of the majority, if one person owned all of the stock of a parent corporation which had a deficit in earnings and profits and that parent corporation owned all of

---

[2] While the ramifications are more apparent in the wholly owned subsidiary context, the difference is only a matter of degree. With real adverse interests in the ownership of a subsidiary, it is unlikely that minority stockholders would permit the use of the earnings of a subsidiary to be distributed other than pro rata. In the instant case the minority shareholders of Kinchafoonee were all members of Cecil's (the decedent) family and, as the record shows, were the beneficiaries under his will. Therefore, there was no more adverse interest here than in the case of a wholly owned subsidiary. It is also worthy of note that Webb Co. during its entire 8-year existence *never reported any taxable income and none of its subsidiaries ever declared a formal dividend,* even though it is clear that at least Kinchafoonee had earnings and profits. Furthermore, in the final windup of Webb Co., the Webb Co. stock held by three of the Webb Co. subsidiaries was "redeemed" for stock that Webb Co. received in a reorganization in which the three heirs of Cecil received cash and stock of a Nebraska corporation for all their interest in Webb Co. and all its subsidiaries. In this manner the remaining earnings of the Webb Co. subsidiaries were received by the Webb Co. stockholders with no tax consequences or only capital gain consequences.

In fact, the record shows that Kinchafoonee had over $1,500,000 of accumulated earnings and profits at the time it acquired the stock of Cecil's estate.

the stock of a subsidiary which had earnings and profits, the stockholder of the parent could draw out all the earnings of the subsidiary over a period of time, resulting in no dividend to the stockholder of the parent or to the parent corporation itself. This result may be illustrated as follows.

A owns all the stock of P which has a deficit in earnings and profits of $200,000. P has no income and therefore no current earnings and profits. S is an operating company with $1 million of accumulated earnings and profits which are increased yearly by current year's earnings. A has S redeem $200,000 of his stock of P. This redemption results in no dividend to A since, under section 304(b)(2)(B), for the purpose of determining the amount constituting a dividend to the stockholder of the parent company as apparently the majority recognizes, the determination is made as if the subsidiary distributed $200,000 to the parent corporation and immediately thereafter the parent distributed $200,000 to its stockholders. Since the $200,000 distribution which the subsidiary is treated as having made merely brings the parent's deficit in earnings and profits to zero, no dividend results to A, the parent's stockholder. Under the view of the majority no distribution is considered to have been made to P by S except for determining whether A received a dividend. Therefore P continues to have a $200,000 deficit in earnings and profits. The procedure of having S purchase $200,000 of A's stock in P could be repeated indefinitely by A under the holding of the majority with no dividend resulting to either A or P. Under a proper interpretation of section 304(a)(2) the first $200,000 distribution by S to its parent, P, would bring P's earnings and profits to zero.[3]

While the majority in discussing the *Union Bankers Insurance Co.* case points to the factual differences in that case and the instant case and refers to the "meshing" of section 304 and section 815, the opinion does state that the reasoning of *Union Bankers* and *Broadview Lumber Co. v. United States, supra,* will no longer be followed insofar as they hold that, in a situation described in section 304(a)(2) and

---

[3] Since under sec. 243 there might be a tax paid by P on the distribution it received from S, there might, after the first distribution, still remain a small deficit in P's earnings and profits.

(b)(2)(B), the "parent corporation realizes a taxable dividend."[4] The statement of the majority *in fact* completely overrules the first issue decided in the *Union Bankers* case and this should be clearly recognized and specifically stated.

Section 815 provides that a distribution by an insurance company corporation to that corporation's shareholders shall be treated as made first from the shareholders surplus account, to the extent thereof, and then from the policyholders surplus account to the extent thereof. The policyholders surplus account is composed of the portions of the current and accumulated earnings and profits of an insurance company which have never been subjected to income tax since these profits are considered as being a reserve for the benefit of the policyholders. Section 815 makes it clear, with exceptions not here relevant, that unless an insurance company corporation distributes to *its shareholders* an amount in excess of its shareholders surplus account, the amount in the policyholders surplus account is not subject to income tax. It is only where an amount distributed to an insurance company corporation's shareholders is treated as being out of the policyholders surplus account that the portion so distributed is subjected to Federal income tax referred to as a phase III tax.

Where a subsidiary insurance company purchases stock of its parent insurance company from that parent's stockholders, the subsidiary has made *no distribution* to its shareholders unless section 304(a)(2) is interpreted as it was in *Union Bankers*. Only by treating the amount paid by the subsidiary to its parent's stockholders as a distribution to the parent under section 304(a)(2) has a distribution been made by the subsidiary to its shareholders. Therefore, under the holding of the majority in this case the shareholder of a parent insurance company corporation could deplete completely the untaxed policyholders surplus account of that parent's subsidiary with no income tax being paid by the subsidiary or by the parent on this previously untaxed amount. The tax avoidance which might result in the case of an insurance company from a failure to treat the acquisition of a parent's stock by its

---

[4] It is of course immaterial whether the distribution from the subsidiary to the parent is taxable. The taxability of a distribution is governed by the facts of the particular case. The basic holding in *Union Bankers* was that there was a *distribution* by the subsidiary to its parent when the subsidiary purchased its parent's stock.

subsidiary as a distribution to the parent for purposes other than determining whether the parent's stockholder has received a dividend is obvious. However, the avoidance in cases of other corporations though less obvious is just as real.

A simple adverse result of the holding of the majority is the milking of a subsidiary's earnings without any tax at the parent level. This may be illustrated by the following example:

A parent corporation has four stockholders and wholly owns a subsidiary that has earnings and profits. Periodically the stockholders of the parent wish to receive the earnings of the subsidiary without tax consequences to the parent, as limited by section 243. Under the majority opinion, each stockholder may sell a pro rata portion of his stock to the corporation, and in this manner have the benefit of two corporate entities without any corporate tax to the parent resulting from the receipt by the parent's stockholders of the subsidiary's earnings. Furthermore, if the earnings and profits of the subsidiary are not reduced (and apparently the majority considers they should not be) the subsidiary holds pieces of paper which are not in reality assets in its hands but carries on its books fictitious earnings and profits.[5]

---

[5] The citation by the majority of Rev. Rul. 70–305, 1970–1 C.B. 169, as modified by Rev. Rul. 74–503, 1974–2 C.B. 117, which deals with the acquisition by a subsidiary corporation of its parent company's stock on *the open market,* highlights its misconception of the purpose of sec. 304(a)(2) and (b)(2)(B). If a subsidiary of a corporation, the stock of which is widely held, buys its parent's stock on the open market or in fact if the parent itself buys its stock on the open market, only in the most technical sense can it be said that a redemption of the stock has occurred. When the stockholder of the parent tells his broker to sell his stock, he never knows who the purchaser is when the sale is made. The corporation buying the stock does not know whose stock it purchased. Even in this situation the stock of the parent in the hands of the subsidiary is an asset only in the sense that the subsidiary can resell the stock on the open market at the will of its parent, thus replacing the funds used to acquire the stock. However, in the case of a closely held corporation resale, if possible, would cause a shift in the corporate ownership generally unacceptable to the controlling shareholders.

Prior to enactment of sec. 1032, gain or loss was recognized where a corporation dealt in open market acquisitions of its own stock. See *Pittsburgh Laundry, Inc.,* 47 B.T.A. 230 (1942); *Cardinal Corp.,* 52 T.C. 119, 126 (1969). Rev. Rul. 70–305, to which the majority refers, merely refused to extend the provisions of sec. 1032 to open market acquisitions of stock of a parent by a subsidiary. Rev. Rul. 74–503 made it clear that no corporation could have a basis other than zero in its own stock and modified Rev. Rul. 70–305 to make it clear that stock of its parent acquired by a subsidiary from its parent's stockholders did not retain a basis other than zero if later acquired by the parent. If the parent did in fact have the subsidiary resell the stock rather than cancel it, gain or loss to the subsidiary is recognized. Nothing in these rulings may properly be read as intimating that stock of a closely held parent

The majority opinion, at page 306, states: "As a result of Kinchafoonee's stock purchase, Webb Co.'s balance sheet was unchanged. Webb Co. retained the same assets, liabilities, and outstanding stock." It further states that Kinchafoonee's balance sheet was changed only in that its "cash was reduced by $288,904 and the Webb Co. stock was added to its other assets," and that "Had Kinchafoonee immediately sold the Webb Co. stock for $288,904 in a separate transaction, Kinchafoonee's balance sheet would have been the same as before it acquired that stock." These statements are inaccurate and misleading. Under section 312(a) and (e) there should be changes in Webb Co.'s accounts to reflect the proper charges to capital and to earnings and profits resulting from the redemption. Also, it is not at all clear, given the nature of Webb Co., that its stock could be sold to outside interests or that it would be worth $288,904. In the case of a wholly owned subsidiary, where the parent's only asset is the subsidiary's stock, there is no real asset in the subsidiary's hands after the purchase of its parent's stock. The subsidiary now has an equity interest in a corporation the only asset of which is the subsidiary's stock. In this situation, it is clear that there has been a reduction in the worth of the subsidiary with no offsetting asset.[6]

The example given by the majority of the limitation of the dividend where the redemption by the parent of the stock would result in a dividend again misconstrues the provisions of the statute. A dividend to the shareholder will not necessarily result if either corporation has earnings but only

corporation in the hands of its wholly owned subsidiary is realistically a salable "asset" of the subsidiary.

[6] The report of the majority speaks of the "value" of the stock of Webb Co. in the hands of Kinchafoonee. However, it is obvious that any "value" to Webb Co. stock in Kinchafoonee's hands is only to the extent of some percentage of the value of stock of other subsidiaries held by Webb Co. Therefore, when the subsidiary is not wholly owned, there may be some value to the parent's stock held by the subsidiary, but certainly the total value of the parent and subsidiary has been reduced by the amount of the subsidiary's funds paid out for its parent's stock. H.Rept. No. 2319, to accompany H.R. 8920 (Pub.L. No. 814), 81st Cong., 2d Sess. (1950), 1950–2 C.B. 380, 420, in effect recognizes the lack of asset value of a parent's stock in the hands of a subsidiary with the statement, "and where such stockholders [of the parent corporation] 'sell' part of their stock in the parent corporation to the subsidiary they nevertheless retain ownership and control of both corporations, since the 'sold' stock is one of the assets which the parent corporation owns by virtue of its possession of all the stock of the subsidiary."

if, after considering the subsidiary to have distributed its earnings to its parent, the parent has sufficient *net* earnings and profits to support the dividend.[7] Furthermore, where the parent's earnings and profits are reduced by taxes paid by it there has been no tax avoidance, and neither section 304(a)(2) nor (b)(2)(B) forces or should force a dividend to that extent.

In conclusion, it is noted that the majority opinion refers to the series of "fictions" which are to be applied to close the loophole "revealed by the *Wanamaker* opinion." However, the majority refuses to carry the "fiction" to its logical and in my view necessary conclusion. Compare the discussion in *United States v. Davis,* 397 U.S. 301, 311 (1970), of application of the attribution rules of section 318 to section 302(b)(1), although there is no specific reference to the attribution rules in that subsection.

Whether the situation here should result in a personal holding company tax to Webb Co. or merely a normal tax on 15 percent of the distribution from Kinchafoonee, I have not considered. It may be that a distribution by Kinchafoone to Webb Co. should not result in a personal holding company tax. However, under section 304(a)(2) there has been a use by Webb Co. of Kinchafoonee's funds which should result in the same tax, if any, to Webb Co. as would result if Kinchafoonee had distributed the $288,904 directly to Webb Co. and Webb Co. had redeemed the stock of Cecil's estate with the funds distributed to it by Kinchafoonee.

---

[7] Footnote 11 of the majority again misconstrues the statute in this respect with the statement "If sec. 304(a)(2) imposes a tax on the parent corporation, sec. 304(b)(2)(B) is superfluous because a dividend to the parent would automatically give the parent earnings and profits equal to the sales price." This is obviously incorrect since the parent might have a deficit in earnings and profits to offset against the dividend. As pointed out in *Union Bankers,* sec. 304(b)(2)(B) makes it clear that the distribution from the subsidiary to the parent is the *first* distribution made so that such an offset is required. After that distribution, the parent is treated as making a distribution to its shareholder.