IMPERIAL GENERAL LIFE INSURANCE COMPANY, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1837–70.   Filed September 25, 1973.

*Donald O. Russell*, for the petitioner.
*Charles B. Norris*, for the respondent.

OPINION

HALL, *Judge:* Respondent determined deficiencies in petitioner's Federal income taxes as follows:

| Year | Deficiency |
| --- | --- |
| 1965 | $39, 152. 81 |
| 1966 | 1, 748. 90 |
| Total | 40, 901. 71 |

This case raises a question of petitioner's taxability under sections 802(b)(3) and 815,[1] the "Phase III" tax under the Life Insurance Company Income Tax Act of 1959.[2]

The facts were fully stipulated and the stipulated facts are found. They will be set forth here only to the extent necessary to understand this opinion. Petitioner, a Missouri corporation, was incorporated in 1923 under the name of Cosmopolitan Life, Health and Accident Insurance Co. It changed its name on July 22, 1965, to Imperial General Life Insurance Co. At the time of filing its petition, St. Louis was its principal place of business. Petitioner is a stock life insurance company subject to the provisions of part I of subchapter L of chapter 1 of the Internal Revenue Code. It filed its U.S. Life Insurance Company Income Tax Returns (Forms 1120L) for the calendar years 1965 and 1966 with the district director at St. Louis, Mo.

On September 18, 1963, Emil Green (Green) and Gale F. Johnston, Jr. (Johnston), purchased for cash all petitioner's outstanding stock, namely 250 common shares. The record does not disclose how the ownership was divided between Green and Johnston. Part or all of the cash for the purchase, $349,020 paid to the sellers, plus a finder's fee of $4,375, was borrowed by Green and Johnston from Mercantile Trust Co. Green and Johnston posted their stock with that bank as security for the loan. At the time, petitioner was engaged exclusively in writing industrial life, health, and accident insurance policies, and did not write ordinary life business. Industrial business is business on which premiums are collected weekly or monthly.

On June 19, 1964, Green and Johnston entered into a written agreement to sell their stock in petitioner for $75,000 to Imperial General Corp. (Imperial), a corporation owned by parties unrelated to Green and Johnston. The purchasers expected to cause petitioner to discontinue the industrial business and enter the ordinary life business. The

---

[1] All Code references are to the Internal Revenue Code of 1954, as in effect during the years in issue.
[2] All other issues raised in the notice of deficiency have been conceded by petitioner.

agreement provided that before the close Green and Johnston would cause to be withdrawn from petitioner all of petitioner's assets except a building located at 3700 Grandel Square in St. Louis, Mo., any assets developed by Imperial as the result of ordinary life insurance business placed on petitioner's books between the date of the agreement and the closing date, and petitioner's charter as a life insurer. Specifically included among the assets which Green and Johnston would withdraw were any industrial life, health, and accident business, and surplus and reserves developed thereby. In addition, Green and Johnston agreed to hold Imperial harmless as to any liabilities with respect to the industrial life, health, and accident business and related assets, except any liabilities with respect to petitioner's building at 3700 Grandel Square, which building was warranted to be free from encumbrances. Imperial paid $10,000 at the time to Green and Johnston and agreed to pay the remaining $65,000 at the close. Imperial was to be given the right (effective at once, and not to await the close), under a general agency contract, to place ordinary life insurance with petitioner, and agreed to cause petitioner to maintain legal reserves on any such business written and to bear all expenses incidental thereto. Imperial agreed to change petitioner's name within 60 days of the close. The close was to take place on the date on which the appropriate Missouri authorities had approved the reinsurance of petitioner's industrial business to Commercial Life Insurance Co. of Missouri, but not later than January 1, 1965. Meanwhile pending regulatory approval, Green and Johnston would continue petitioner's industrial business for their own account, but would withdraw from petitioner all such business and the assets, reserves, surplus, and liabilities connected therewith, other than the building, at the closing, through a reinsurance agreement.

In the latter part of 1964, petitioner started writing ordinary life insurance (in effect for the account of Imperial) while continuing to write industrial policies (in effect for the account of Green and Johnston or Commercial Life Insurance Co. of Missouri).

Commercial Life Insurance Co. of Missouri was consolidated with Commercial State Life Insurance Co. in November 1964, the latter being the surviving company. References hereafter to "Commercial" will mean Commercial State Life Insurance Co. Commercial was a Missouri corporation principally engaged in the business of selling life insurance, with its principal office in St. Louis. Green, Johnston, and Mortimer S. Green acquired 49,750 shares of the 50,000 outstanding shares of Commercial's common stock (or 99.5 percent) on May 1, 1964, for a price of $1,675,000, and thereafter purchased 33 of the 250 remaining shares for $2,475. All three became directors of Commercial. Emil Green became president, and Mortimer S. Green vice

president. The record does not disclose what, if any, family relationship existed between Emil Green and Mortimer S. Green, nor the proportions in which the three shareholders of Commercial owned its shares.

At some time between June 19, 1964, and November 11, 1964, Green and Johnston agreed with Commercial that Commercial would by contract reinsure, i.e., acquire the assets and assume the risks of, petitioner's industrial business, for which business Commercial agreed to pay Green and Johnston $403,000 plus "interest and bank charges" (apparently on Green and Johnston's loan from Mercantile Trust Co.). On October 22, 1964, Commercial's board of directors approved all of the following: The execution of an agreement with Green and Johnston providing for the purchase by Commercial of all of the stock of petitioner for $410,305.30 "plus carrying charges"; the filing of a registration statement with the Securities and Exchange Commission for the issuance by Commercial to the public of 300,000 new shares of stock; a redemption agreement under which Commercial would redeem from Green, Johnston, and Mortimer S. Green certain of Commercial's outstanding shares for $1,692,429.33 "plus interest and carrying charges"; the reinsurance by Commercial of all petitioner's debit (industrial) life, health, and accident insurance; the consolidation of Commercial Life Insurance Co. of Missouri with Commercial; and the sale by Commercial of petitioner's stock (the assets and liabilities of the industrial business other than the building to have been first withdrawn through the reinsurance agreement) to Imperial for $75,000. Petitioner's board of directors approved the consolidation and reinsurance agreements on October 22, 1964.

On November 6, 1964, Commercial's stockholders approved the consolidation with Commercial Life Insurance Co. of Missouri and the reinsurance agreement with petitioner, and petitioner's shareholders approved the reinsurance agreement.

The record does not disclose the reason for the modification of the original plan whereby Green and Johnston would have sold their stock to Imperial for $75,000 after first causing petitioner's industrial business to be withdrawn from petitioner and transferred to Commercial, and under which Commercial would have paid Green and Johnston $403,000 plus interest for the industrial business it was to acquire from petitioner. But for whatever reason, the plan was not consummated in that form. Rather than receiving a $403,000 payment from Commercial for the industrial business of petitioner, and then selling the stock to Imperial for $75,000, Green and Johnston instead sold their stock in petitioner to Commercial on May 6, 1965, for $425,654.76. On the same day, Commercial withdrew from petitioner under the reinsurance agreement all of petitioner's industrial assets,

liabilities, surplus, and reserves, leaving only the building, the charter, and assets and liabilities arising from the post-June 19, 1964, ordinary life insurance business, and Commercial sold the stock of the thus-shrunken company to Imperial. Since Imperial had already paid $10,000 down to Green and Johnston on the petitioner's stock, the stock sale agreement between Commercial and Imperial, as modified, called for Imperial to pay Commercial $65,000, rather than $75,000, for the stock. Imperial paid this amount to Commercial on May 6, 1965, and on the same day acquired all of petitioner's stock. Thereafter, petitioner continued under the new stock ownership the ordinary life insurance business which it had commenced for the account of Imperial in the latter part of 1964. On July 22, 1965, Imperial changed petitioner's name from Cosmopolitan Life, Health and Accident Insurance Co. to Imperial General Life Insurance Co. Adjustments in petitioner's reserves applicable to the transferred industrial life business were made on petitioner's 1965 income tax return under section 806(a) for the assumption reinsurance, based on a daily proration to an April 30 transfer date. The return also claimed a deduction on line 19 of Schedule E (Gain and Loss from Operations) of $83,651.18 as "Excess of Assets Over Liabilities Transferred to Commercial State Life Upon Transfer of Business."[3] The fair market value of petitioner's industrial business on April 30, 1965, was no less than $350,000, exclusive of the office building.[4]

Petitioner's life reserves, per its 1965 return, dropped from $537,-986.06 on December 31, 1964, to $65,113.43 on December 31, 1965.

---

[3] The record fails to disclose precisely how petitioner arrived at the $83,651.18 figure. On petitioner's "Reconciliation of Net Gain With Annual Statement" on its return the same amount is shown as "Surplus Transferred to Commercial State Life Not Shown as Operating Charge in Statement." The record of this case does not include financial statements as of Apr. 30, 1965, when the Reinsurance Agreement became effective, but it appears that the $83,651.18 represented the excess, as of that date, of the book value of the assets transferred to Commercial over the reserve liabilities and other liabilities concurrently transferred. Petitioner's return states that on Apr. 30, 1965, petitioner transferred to Commercial $649,576.30 of sec. 805(b)(4) assets and $9,788.92 of furniture and equipment, a total of $659,365.22, and that petitioner also transferred life reserves applicable to the industrial business of $531,584.50. Neither the return nor anything else in the record, however, discloses what, if any, other liabilities of petitioner were assumed by Commercial.

[4] The best evidence in the record bearing on the fair market value of the excess of assets over liabilities distributed by petitioner to Commercial, is the fact that Commercial paid $425,654.76 for the stock when petitioner still held these assets and liabilities, and that the stock was at once sold for $75,000, including the $10,000 downpayment paid Green and Johnston pursuant to the original plan, after withdrawing the assets, liabilities, and reserves in question. The inference we can draw is that the net fair market value of the transferred business (assets, liabilities, surplus, and reserves) was the difference, or not less than $350,000. While this amount is substantially greater than the $83,651.18 which respondent determined to have been distributed, the difference appears to have arisen because respondent measured the distribution at book value rather than at fair market value as prescribed by sec. 1.815–2(b)(3), Income Tax Regs. This error, if any, however was in favor of petitioner, and did not affect the amount of the deficiency, for even $83,651.18, when grossed up with the Phase III tax attributable thereto was more than sufficient to exhaust both the shareholders and policyholders surplus accounts, thereby generating the maximum possible Phase III tax and rendering moot for present purposes the question whether the distribution in fact exceeded $83,651.18.

However, petitioner reported no income on its 1965 return from decrease in reserves under section 809(e)(2).

Petitioner's policyholders surplus account on December 31, 1965, before any subtractions therefrom under section 815, amounted to $95,084.21. Petitioner's shareholders surplus account on the same date was $24,355.62 before any such subtractions.

Under the Life Insurance Company Tax Act of 1959, the "life insurance company taxable income" of a life insurance company includes three parts, popularly referred to as Phases I, II, and III. Sec. 802(b). Phase I is taxable investment income (as defined in section 804), or gain from operations (as defined in section 809), if smaller. Phase II constitutes 50 percent of the excess, if any, of gain from operations over taxable investment income. Speaking very generally, by this mechanism, all of the life insurance company's share (as distinguished from the policyholders' share) of its investment income, plus half of any remainder of its total income ("gain from operations") are taxed currently. S. Rept. No. 291, 86th Cong., 1st Sess., pp. 20–21 (1959). Any untaxed portion of the gain from operations, plus certain deductions allowed, are added to a special account called the policyholders surplus account. Sec. 815(c)(2). The Phase III tax in issue here is triggered whenever a distribution to shareholders is subtracted from the policyholders surplus account. Sec. 802(b)(3); sec. 815(a) and (c)(3). Also subtracted from the policyholders surplus account is the increase in tax caused by the Phase III addition to taxable income. Sec. 815(c)(3)(B). This increase is computed at the marginal rate appropriate to the taxpayer.[5] Sec. 1.815–4(c), Income Tax Regs.

---

[5] In the present case, respondent determined that petitioner distributed $83,651.18 to its shareholders in 1965. Treating the first $24,375.64 of this amount, pursuant to sec. 815(a)(1), as being distributed out of the shareholders surplus account (this being the 1965 yearend balance thereof after subtracting the taxes on petitioner's income computed without regard to the Phase III tax), the remainder was $59,275.54. Respondent's explanation of items, schedule 10, attached to his statutory notice of deficiency, appears to mislabel the $24,375.64 subtracted, but disregarding this labeling error, the computations were correctly made. Petitioner has not complained of any inaccuracy in the computation. Under sec. 815(c)(3)(B), respondent next computed the increase in petitioner's tax attributable to the addition to petitioner's income of the $59,275.54, "grossing up" the tax with the distribution as required under secs. 802(b)(3) and 815(c)(3). The resulting amount was $101,504.36. However, since this amount exceeded the $95,084.21 balance in petitioner's policyholders surplus account, a further computation was made to comply with the mandate of sec. 815(a)(2) that after exhausting the shareholders surplus account, distributions to shareholders shall be treated as made "out of the policyholders surplus account, *to the extent thereof.*" (Emphasis added.) The regulations under sec. 815 make no express allowance for the possibility that a distribution plus the tax attributable thereto may more than exhaust the policyholders surplus account. However, sec. 1.815–2 (b)(1)(ii), Income Tax Regs., provides that "Once the shareholders surplus account has been reduced to zero, distributions shall then be treated as being made out of the policyholders surplus account * * * until that account *has been reduced to zero.*" (Emphasis added.) Since treating the full $101,504.36 tentatively computed would reduce the policyholders surplus account below zero, respondent recomputed the tax as the added tax of $39,147.15 resulting from inclusion in petitioner's life insurance company taxable income

In the case of withdrawals of assets other than cash, the amount withdrawn for purposes of section 815 is based upon the fair market value, rather than the book value, of the withdrawn assets. Sec. 1.815–2(b)(3), Income Tax Regs. Petitioner does not contest the validity of these regulations. Distributions to shareholders are treated as coming first out of the shareholders surplus account and, after it has been reduced to zero, next out of the policyholders surplus account, before coming out of other accounts. Sec. 815(a) ; sec. 1.815–2(b)(1), Income Tax Regs. The net value of the assets transferred by petitioner to Commercial was at least $350,000, far more than sufficient to exhaust the $119,439.83 combined total of petitioner's shareholders and policyholders surplus accounts. Thus, if the transfer of the industrial business constitutes a "distribution to shareholders" within the meaning of section 815, respondent must be sustained. The term "distribution to shareholders" has a very broad meaning. Subchapter L permits deferral of tax on gain from operations only so long as such gains remain in the policyholders surplus account. When the shareholders withdraw such gains in any manner the tax must be paid. It does not matter whether the withdrawal takes the form of a declared dividend, a stock redemption, or a partial liquidation. In each such case, the distributing corporation has demonstrated that it does not regard retention of the amounts in question as required for policyholder protection. Having been treated as distributable income by the corporation, they are treated as taxable income by the tax law. See S. Rept. No. 91–552, 91st Cong., 1st Sess., p. 283 (1969) ; S. Rept. No. 490, 90th Cong., 1st Sess., pp. 15–16 (1967).

In the present case, Green and Johnston, who owned all the stock of petitioner and an apparently substantial interest in the stock of Commercial, caused petitioner to transfer to Commercial assets with a fair market value more than sufficient to trigger the full potential Phase III tax. If Green's and Johnston's sale of stock to Commercial is viewed as having made Commercial the shareholder of petitioner as of the distribution, the transfer of the industrial business from petitioner to Commercial would clearly be a "distribution to shareholders," triggering the tax. Petitioner argues, however, that no distribution to shareholders took place because the distribution in question was made to Commercial before it became the shareholder of

---

of an amount ($55,937.06) equal, together with the tax thereon ($39,147.15) to the full balance in the policyholders surplus account, namely $95,084.21. Despite the lack of an example or precise instructions in the regulations covering the method of computation in a situation such as the present where the distribution out of the policyholders surplus account plus the tax attributable thereto on a grossed-up basis may exceed the balance in the account, respondent's method appears to comport with the statutory language and intent. See Denney, Rua, and Schoen, Federal Income Taxation of Insurance Companies 8.11 (2d ed. 1966). In any event, petitioner has made no complaint regarding the computation method.

petitioner. Petitioner points out that the distribution (the assumption reinsurance and transfer of risks) took place on April 30, 1965, at least according to petitioner's tax return, a date on which Green and Johnston were still shareholders of petitioner; and that it was not until 6 days later, on May 6, 1965, that Commercial became a shareholder.

The difficulty with this argument is that any *distribution* on April 30 in fact went to Green and Johnston, not to Commercial.[6] On April 30, Green and Johnston were petitioner's shareholders. Commercial paid fair value for petitioner's assets, but Green and Johnston, *not* petitioner, received the payment. The net effect, therefore, was precisely that of the transactions originally planned. Petitioner's assets in net effect were withdrawn by Green and Johnston, converted to cash by sale to Commercial, and applied to discharge Green's and Johnston's bank liabilities. The distribution was no less one to shareholders because the formality of channeling the payment for petitioner's assets to petitioner on the way to its shareholders was omitted.

In summary, petitioner ended up without its industrial business and Green and Johnston ended up with the consideration for the sale of the business. However one chracterizes the intermediate steps to that end result, it is clear that a distribution to shareholders took place. Either Green and Johnston sold their stock to Commercial and Commercial then distributed the assets to itself as the shareholder of petitioner, or Green and Johnston caused Commercial to pay to them rather than to petitioner the purchase price for petitioner's assets. Such a diversion of petitioner's sales proceeds to its stockholders would, of course, constitute just as much a distribution to stockholders as if petitioner had received the cash and declared a dividend with it.

Petitioner further contends on its 1965 return and in its petition that the $83,651.18 was allowable as a deduction under section 809(d)(7)[7] as "Excess of Assets Over Liabilities Transferred to Commercial State Life Upon Transfer of Business"[8] and was not a dividend distribution.

---

[6] Respondent also argues that petitioner makes the argument too late. Since we reject the argument, we need not decide whether respondent was adequately on notice thereof.

[7] While the deduction was claimed on line 19 of Schedule E of petitioner's return under "other deductions," thus evidently being originally claimed under sec. 809(d)(12), and while no deduction was claimed on line 15 as "Assumption by another person of liabilities under insurance, etc. contracts," where a sec. 809(d)(7) deduction would properly be claimed, petitioner's brief argues that the deduction was allowable under sec. 809(d)(7).

[8] Petitioner also contended in its opening statement "that in substance a reorganization occurred either under Code Sections 368(a)(1)(D) or 368(a)(1)(F) whereby Commercial * * * merged all of the assets of [petitioner] subject to liabilities." In its brief, however, petitioner conceded that none of the reorganization methods authorized under sec. 368 were feasible, because they would have caused the cancellation of petitioner's charter. We read this statement as an abandonment of the reorganization contention.

When an insurance company enters a reinsurance assumption agreement, as in the present case, both assets and liabilities (including reserves) are transferred by the reinsured to the reinsurer. The Code provides for appropriate tax adjustments for both parties to reflect such a transaction. See *Kentucky Central Life Insurance Co.*, 57 T.C. 482, 496 (1972). The reinsured party (petitioner) must include in its gain from operations the net decrease in its reserves brought about by the reinsurer's assumption of the reserves. Sec. 809(c)(2). It then may deduct any consideration paid the reinsurer for assuming the liabilities under the reinsured contracts. Sec. 809(d)(7).

Petitioner did not report any section 809(c)(2) income, although there was clearly a substantial diminution in its reserve liability through the reinsurance assumption agreement. The reserves applicable to the industrial business were reported as $531,584.50 as of April 30, 1965. Its total life reserves, per return, were $537,986.06 on December 31, 1964, and only $65,113.43 on December 31, 1965. Likewise, petitioner's section 805(b)(4) assets declined from $746,924.90 on January 1, 1965, to $172,947.76 on December 31, 1965. While the record fails to disclose how much of the $573,977.14 diminution in assets was attributable to the transfer of assets to Commercial, it seems clear that the bulk of the diminution was so attributable. From the language in which the claimed $83,651.18 deduction was claimed on the return, we infer that rather than report the reserve diminution as income under sections 809(c)(2) and 810(a), and then claim a deduction under section 809(d)(7) for the book value of all the assets turned over to the reinsurer, the return simply offset the liabilities of which petitioner was relieved under the reinsurance agreement against the assets it relinquished, and reported the excess of assets over liabilities, $83,651.18, as "other deductions."

Section 809(d)(7), on which petitioner relies, allows a deduction in computing gain from operations of "The consideration (other than consideration arising out of reinsurance ceded) in respect of the assumption by another person of liabilities under insurance and annuity contracts (including contracts supplementary thereto)." Section 1.809–5(a)(7), Income Tax Regs., illustrates the provisions of section 809(d)(7) with the following example:

During the taxable year 1958, T, a life insurance company, transferred a block of insurance policies and made a payment of $50,000 to R, a life insurance company, under an arrangement whereby R became solely liable to the policyholders on the policies transferred by T. Under the provisions of section 809(d)(7) and this subparagraph, T is allowed a deduction of $50,000 for the taxable year 1958. * * *

As the example makes clear, section 809(d)(7) applies when a reinsuring company pays a reinsurer a consideration to assume the liabil-

ities on a block of business transferred. In other words, it applies where an equalizing payment is necessary because the net fair market value of the business transferred would otherwise be negative. In the present case, however, it is clear not only that the book value of the assets transferred exceeded the liabilities of which petitioner was to be relieved, but also that the fair market value of the assets transferred even more substantially exceeded those liabilities. Petitioner did not have to pay extra consideration beyond book value to Commercial to be relieved of the liabilities of the industrial business. On the contrary, Commercial paid Green and Johnston handsomely beyond net book value in order to acquire that business. Had Commercial paid petitioner, rather than its shareholders, for petitioner's assets, it would be clear that no section 809(d)(7) deduction would be available. The mere diversion to Green and Johnston of the proceeds of the sale of petitioner's industial business did not convert the transaction into one in which petitioner was paying Commercial to take the business off its hands.

Petitioner's error lies in its failure to recognize that the assets were not transferred to Commercial at arm's length as *"consideration"* for Commercial's assumption of the reserve liabilities. Commercial did not acquire all of petitioner's assets at the mere price of the assumption of petitioner's liabilities. Rather, Commercial had to, and did, pay $425,654.76 for petitioner's stock, of which some $350,654.76 was directly attributable to the excess of the value of petitioner's industrial assets over liabilities, for immediately after extracting these assets and liabilities, petitioner, pursuant to prearrangement, resold the stock for $75,000. In substance, petitioner sold its industrial assets to Commercial for $350,654.76 plus assumption of the associated liabilities, and caused payment to be made to Green and Johnston. The $83,651.18 in question was not a price paid Commercial to take liabilities off petitioner's hands, for the reverse was true. Commercial paid a high price over and beyond the assumption of the liabilities to acquire those assets. Consequently, we hold that the $83,651.18 did not represent consideration in respect of the assumption by another person of liabilities, and that it is not deductible under section 809(d)(7).

*Decision will be entered for the respondent.*