VIRGINIA MATERIALS CORPORATION, PETITIONER *v.*
COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 7295–74.   Filed December 2, 1976.

*Peter W. Martone* and *Leroy T. Canoles, Jr.,* for the petitioner.

*J. Doyle Tumbleson* and *George H. Jelly,* for the respondent.

OPINION

BRUCE, *Judge:* Respondent determined a deficiency of $83,209.70 in petitioner's Federal income tax for its taxable year ended September 30, 1970. The issues presented for our decision are (1) whether petitioner, Virginia Materials Corp., constructively received a taxable distribution when its wholly owned subsidiary, Tidewater Industrial Development Corp., purchased shares of petitioner's stock, and if the first question is answered affirmatively, (2) whether the amount of the taxable distribution is limited to the accumulated earnings and profits of the subsidiary.

All of the facts having been stipulated by the parties, this case was submitted under Rule 122, Tax Court Rules of Practice and Procedure. We adopt the stipulation of facts and the exhibits attached thereto as our findings. The pertinent facts are summarized below.

Virginia Materials Corp. (hereinafter referred to as petitioner or the parent corporation) is a corporation organized and existing under the laws of the State of Virginia, with its principal office at Norfolk, Va. Petitioner timely filed its Federal income tax return for its taxable year ended September 30, 1970, with the Internal Revenue Service Center at Philadelphia, Pa.

Petitioner, at all relevant times, has been in the business of processing slag into industrial abrasives. From the time of its incorporation until March 16, 1970, petitioner had issued and outstanding one class of stock, voting common stock, which was owned as follows:

| Stockholder | Number of shares | Percent ownership |
|---|---|---|
| Exner Corp. | 50 | 50 |
| General Slag Corp. | 25 | 25 |
| L. D. Edwards | 25 | 25 |
| Totals | 100 | 100 |

L. D. Edwards, a Virginia resident, was the president, a director, and a full-time employee of petitioner during the taxable year in issue. Both the Exner Corp. (hereinafter referred to as Exner) and General Slag Corp. (hereinafter referred to as General Slag) are corporations existing under the laws of the State of New York. Edwards has never possessed any interest whatsoever in either Exner or General Slag, and he has never been related by blood or marriage, or in any other manner contemplated by section 318 of the Internal Revenue Code of 1954,[1] to any of the stockholders of those corporations.

Tidewater Industrial Development Corp. (hereinafter referred to as TIDC or the subsidiary corporation) was organized as a Virginia corporation in 1961. From the time of its inception, TIDC had issued and outstanding one class of

---

[1] Unless otherwise indicated all statutory references are to the Internal Revenue Code of 1954, as amended.

stock, voting common stock, all of which stock was owned by petitioner. TIDC engaged in the business of leasing rolling equipment and the business of land development. L. D. Edwards was also the president and a director of TIDC during the taxable year in issue.

On or about March 16, 1970, as the result of negotiations among petitioner, TIDC, Exner, and General Slag, petitioner redeemed all of its common stock owned by Exner for $800,000. Of this amount, $333,333 was paid in cash, and the balance of $466,667 was evidenced by an interest bearing note from petitioner. Simultaneously therewith, TIDC purchased from General Slag for $400,000 all of petitioner's common stock owned by General Slag. Of this amount, $166,667 was paid in cash, and the balance of $233,333 was evidenced by an interest bearing note from TIDC. The cash tendered by TIDC was obtained through a loan from petitioner. After these transactions, the only interests which Exner and General Slag retained in petitioner and TIDC were those of creditors to the extent represented by their respective notes. Accordingly, petitioner's outstanding stock was then owned 50 percent by L. D. Edwards (25 shares) and 50 percent by TIDC (25 shares). All of TIDC's outstanding stock continued to be owned by petitioner.

The sole purpose in having TIDC purchase the stock owned by General Slag was to do indirectly that which petitioner could not have done directly and legally under State law. On March 16, 1970, petitioner's earned surplus was approximately $829,000. Under Virginia law, petitioner was prohibited from redeeming all of the common shares in issue. TIDC purchased General Slag's stock in petitioner in order to legally avoid the statutory prohibition. At the time of the purchase, TIDC had earnings and profits of $108,444.37.

Respondent determined that as a result of TIDC's $400,000 purchase of petitioner's stock, petitioner constructively received a $400,000 distribution from TIDC, consisting of $108,444.37 of ordinary dividend income, $25,000 return of capital, and $266,555.63 of long-term capital gain. Petitioner contends initially that it did not constructively receive taxable income by virtue of TIDC's stock purchase, but if we hold contrary, that the amount of the taxable distribution is

limited to the ordinary dividend income of $108,444.37, i.e., the extent of the earnings and profits of TIDC.

At the outset it may prove beneficial to clarify some matters which are not at issue herein. The redemption of the stock owned by Exner was not a taxable event to petitioner. Furthermore, since the redemption satisfied the requirements of section 302(b)(3),[2] exchange treatment resulted to Exner under section 302(a).[3] There is no dispute relative to that part of the transaction. The parties are also in agreement that section 304 required TIDC's stock purchase from General Slag to be treated at the shareholder level, i.e., by General Slag, as if the stock had been redeemed by petitioner. Since this constructive redemption constituted a complete termination of General Slag's interest in the stock of petitioner, exchange treatment also resulted to General Slag under sections 302(b)(3) and 302(a). See sec. 1.304–3, Income Tax Regs. At issue here is the tax consequences resulting to petitioner because of the application of the constructive redemption provisions of section 304 to TIDC's purchase of stock of its parent.

The central issue, then, is a narrow one of statutory interpretation. Restated concisely, the question is whether a parent corporation constructively receives a taxable distribution from its controlled subsidiary when the subsidiary purchases stock of the parent corporation from a shareholder of the parent. Resolution of the issue turns on whether the application of section 304(a)(2) as supplemented by section 304(b)(2)(B) is limited to determining tax consequences to the selling shareholder, or whether the cited sections, when applicable, also construct a taxable intercorporate distribu-

---

[2] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(b) REDEMPTIONS TREATED AS EXCHANGES.—

(3) TERMINATION OF SHAREHOLDER'S INTEREST.—Subsection (a) shall apply if the redemption is in complete redemption of all of the stock of the corporation owned by the shareholder.

[3] SEC. 302. DISTRIBUTIONS IN REDEMPTION OF STOCK.

(a) GENERAL RULE.—If a corporation redeems its stock (within the meaning of section 317(b)), and if paragraph (1), (2), (3), or (4) of subsection (b) applies, such redemption shall be treated as a distribution in part or full payment in exchange for the stock.

tion from the purchasing subsidiary to its parent. The relevant portions of section 304 are set forth below:

SEC. 304. REDEMPTION THROUGH USE OF RELATED CORPORATIONS.

(a) TREATMENT OF CERTAIN STOCK PURCHASES.—

* * *

(2) ACQUISITION BY SUBSIDIARY.—For purposes of sections 302 and 303, if—

(A) in return for property, one corporation acquires from a shareholder of another corporation stock in such other corporation, and

(B) the issuing corporation controls the acquiring corporation,

then such property shall be treated as a distribution in redemption of the stock of the issuing corporation.

(b) SPECIAL RULES FOR APPLICATION OF SUBSECTION (a).—

* * *

(2) AMOUNT CONSTITUTING DIVIDEND.—

(B) WHERE SUBSECTION (a) (2) APPLIES.—In the case of any acquisition of stock to which subsection (a) (2) of this section applies, the determination of the amount which is a dividend shall be made as if the property were distributed by the acquiring corporation to the issuing corporation and immediately thereafter distributed by the issuing corporation.

Petitioner argues that the quoted statutory language and its legislative history conclusively show that the sole purpose for the enactment of section 304 was to construct and measure the amount of dividend, if any, at the shareholder level. Petitioner correctly points out that section 115(g)(2) of the Internal Revenue Code of 1939, the predecessor of section 304(a)(2), was the legislative response to *Rodman Wanamaker Trust,* 11 T.C. 365 (1948), affd. per curiam 178 F.2d 10 (3d Cir. 1949), where this Court held that a wholly owned subsidiary corporation's purchase of its parent corporation's stock did not result in a taxable dividend to the selling shareholders even though if the parent had directly redeemed its stock the redemption would have resulted in a distribution of earnings that was essentially equivalent to a dividend.

Respondent acknowledges the motivation for the enactment of 1939 Code section 115(g)(2), and section 304(a)(2), but seizes upon the "as if" clause of section 304(b)(2)(B), which was newly enacted in the 1954 Code, to support his contention that a taxable distribution is constructively received by the parent corporation when the constructive redemption provisions of section 304 are activated. Respondent concedes that

the "literal purpose" of section 304(b)(2)(B) is to state the method by which the amount of dividend to the selling shareholder is determined in a section 304(a)(2) constructive redemption, but argues that the parent corporation must be deemed to have received an intercorporate distribution in the amount of the purchase price of the stock in order for the overall statutory scheme to remain consonant with its underlying rationale. Respondent submits that unless petitioner is deemed to have received a taxable distribution, petitioner will have obtained the benefit of a $400,000 distribution from its subsidiary without having to pay any tax thereon. Petitioner would in this manner, says respondent, escape tax that it would otherwise have had to pay if TIDC had distributed sufficient funds to petitioner for petitioner itself to have *redeemed* General Slag's stock.

Respondent relies upon his own application of the provisions of section 304 in Rev. Rul. 69–261, 1969–1 C.B. 94, and upon this Court's decision in *Union Bankers Insurance Co.*, 64 T.C. 807 (1975). In Rev. Rul. 69–261, it was concluded that "from the application of section 304(b)(2) of the Code," the purchase of a parent's stock from its sole shareholder by a wholly owned subsidiary resulted in a constructive dividend to the parent as well as to the selling shareholder. Likewise, in *Union Bankers* we held that in a section 304(a)(2) transaction the parent corporation constructively received a taxable dividend from its subsidiary.[4]

Petitioner recognizes that both the revenue ruling and *Union Bankers* take a view of section 304 contrary to that which it urges upon us but submits that both are incorrect. We agree. It is well settled, of course, that revenue rulings are not binding upon the courts. *Union Bankers Insurance Co., supra* at 836. In addition, since the submission of briefs herein, we have had an opportunity to reexamine our holding in *Union Bankers*. In *Helen M. Webb*, 67 T.C. 293 (1976) (Court reviewed), we rejected the reasoning of *Union Bankers* and declined to follow that decision on the issue presently before us.[5]

---

[4] The reasoning of *Union Bankers* was subsequently adopted in *Broadview Lumber Co. v. United States*, an unreported case (N.D. Ind. 1975, 36 AFTR 2d 75–6367, 75–2 USTC par. 9832).

[5] Although both *Union Bankers* and *Webb* speak in terms of the constructive

The *Webb* case involved a controlled subsidiary corporation which purchased from a decedent's estate a portion of the stock of the subsidiary's parent corporation. We examined at length the statutory language and legislative history of section 304(a)(2) and (b)(2)(B) and held, the whole Court sitting, that the parent corporation did not constructively receive a taxable dividend from its subsidiary as a result of the stock purchase.

Considering the exhaustive review of the relevant statutory provisions and the appropriate interpretive aids in *Webb,* we do not think it necessary to fully restate our rationale here. The following extracts from that opinion sufficiently define the basis of our decision:

section 304(a)(2) provides that the "property" received in return for the stock "shall be treated as a distribution in redemption of the stock of the issuing corporation." This language obviously refers to a distribution *by* the parent corporation to the shareholder, not a distribution *to* the parent corporation. Such treatment of the property received by the parent corporation's shareholder in exchange for his stock provides no basis for taxing the parent corporation with a dividend from its subsidiary. [*Helen M. Webb,* 67 T.C. at 303.]

The function of section 304(a)(2) and (b)(2)(B) is to insure that the redemption-distribution provisions of sections 301 through 303 are not circumvented by a sale of a parent's stock to a controlled subsidiary, nothing more. See H. Rept. No. 2319, *supra,* 1950–2 C.B. at 420. Under section 304(b)(2)(B), headed "Amount constituting dividend," the amount of the dividend to the selling shareholder is to be determined "as if" the subsidiary corporation had first distributed the stock's selling price to the parent corporation and the parent immediately distributed it to the shareholder. This provision is simply a mechanism by which earnings and profits of the parent corporation are adjusted for the purpose of *"the determination of the amount which is a dividend"* (emphasis added). It has nothing to do with the amount of the income of the parent corporation. [*Helen M. Webb, supra* at 305. Fn. ref. omitted.]

On the threshold question of whether petitioner constructively received a taxable distribution from TIDC upon TIDC's purchase of stock from General Slag, *Webb* clearly compels a

---

receipt of taxable *dividends,* while we are confronted with a hypothetical distribution exceeding the earnings and profits of the subsidiary corporation, we do not perceive that distinction to be of any consequence in the statutory construction of section 304(a)(2) and (b)(2)(B). The basic holdings of those cases are concerned with *distributions,* the taxability of which will be governed by the facts of the particular case. See *Helen M. Webb,* 67 T.C. 293, 300 n. 4(1976) (SCOTT, J., dissenting).

negative answer.[6] This resolution eliminates the need to consider the further issue originally stated as to the amount of any constructive distribution deemed to have occurred.

*Decision will be entered for the petitioner.*

---

[6] Although we find it unnecessary to detail the parties' arguments herein at length, in view of the contrasting positions of the majority and dissenting opinions in *Webb,* we think it pertinent to note that respondent's argument herein was premised almost entirely on sec. 304(b)(2)(B). Rev. Rul. 69–261, 1969–1 C.B. 94, was likewise premised upon that section. The significance of this notation is that *Union Bankers,* as Judge Scott makes clear in her dissent in *Webb,* was based upon her interpretation of sec. 304(a)(2). Although respondent urges upon us the result in *Union Bankers,* his declination to rely upon the rationale of that decision and his concession of the "literal purpose" of sec. 304(b)(2)(B), *supra* at 376, 377, lends credence to the conclusion which we reach.