CONTINENTAL BANKERS LIFE INSURANCE COMPANY OF THE SOUTH, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3643-85, 29843-85.    Filed July 12, 1989.

*O. Jan Tyler* and *Charles D. Wilson,* for the petitioner. *Daniel J. Wiles* and *Judy Jacobs,* for the respondent.

PARR, *Judge:* Respondent determined deficiencies in and additions to petitioner's Federal income tax as follows:

| Calendar year | Deficiency | Additions to tax sec. 6651(a)(1) [1] |
|---|---|---|
| 1976 | $310,400 | - - - |
| 1977 | 168,893 | - - - |
| 1978 | 97,144 | $24,286 |
| 1979 | 30,260 | 1,513 |
| 1980 | 356,297 | - - - |

After concessions, the issues for decision are: (1) Whether petitioner's acquisitions of its parent and sister corporations' stock in Continental Bankers Life Insurance Company of the North are treated as distributions in redemption of petitioner's stock under section 304(a)(1), and, if so, whether petitioner made distributions under section 815 resulting in phase III taxable income under section 802(b)(3) to the extent made out of its policyholders' surplus account; and (2) whether petitioner is entitled to an operations loss carryover deduction in 1976 attributable to a $126,049.26 bad debt deduction originally claimed on its 1973 Federal income tax return.

## FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulation of facts and related exhibits are incorporated herein by this reference.

Petitioner is a Tennessee chartered life insurance company, filing its Federal income tax returns for the years at issue with the Internal Revenue Service Center in Memphis, Tennessee. At the time the petitions in this case were filed, petitioner's principal place of business was in Dallas, Texas.

### Stock Transactions

Immediately prior to December 31, 1977, Financial Assurance, Inc. (Financial) owned 100 percent of the stock of petitioner, 56.32 percent of the stock of Continental Bankers Life Insurance Company of the North (CBN), and 100 percent of the stock of Capitol Bankers Life Insurance Company (Capitol). Capitol owned 20 percent of the stock of CBN.

---

[1]Unless otherwise provided, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the years at issue.

On October 18, 1977, a letter agreement was signed providing for the sale of all of Financial's stock in Capitol to Mr. Everett J. Garner, Jr., effective September 30, 1977 (Purchase Agreement). The purchase price was based upon a formula set forth in the Purchase Agreement, and Mr. Garner tendered a $150,000 refundable deposit. The Purchase Agreement expressly provided that, prior to closing, all of Capitol's stock in CBN (100,000 shares) be sold to Financial for $1.60 per share in cash or securities. The closing of Financial's sale of its Capitol stock was first scheduled to occur on October 30, 1977, but was later delayed to December 30, 1977.

On December 30, 1977, a Closing Agreement was signed providing for the sale of all of Financial's stock in Capitol to Mr. Garner and ten other individuals. On December 31, 1977, an Amendment to the Closing Agreement was signed increasing the purchase price by $10,000 and modifying the terms of payment.

The Closing Agreement provided that it was entered into "Pursuant to and as a part of the Purchase Agreement." The Closing Agreement also provided that it "shall in no way be construed as superceding or altering any of the terms or conditions of the * * * Purchase Agreement, unless specifically so stated." Finally, Article V of the Closing Agreement provided:

In lieu of the repurchase of the 100,000 shares of * * * [CBN] by * * * [Financial], the PURCHASERS acknowledge receipt from * * * [petitioner] of mortgages in the amount of $150,905 assigned to Capitol * * * , with a 1 percent servicing agreement on such mortgages, and a receipt of a note from * * * [petitioner], payable to Capitol * * * in the amount of $9,095, in exchange for 100,000 shares of stock of * * * [CBN] held as an asset by Capitol * * * . It is agreed by the parties that this note will be paid off simultaneously with the payment of the note specified in Article III * * * .

Capitol transferred all of its stock in CBN to petitioner at the closing of the sale by Financial of all of its stock in Capitol. The purchasers later defaulted on a promissory note given to Financial as part payment for the Capitol stock, and Financial reacquired the stock through foreclosure in 1978. The Capitol stock was ultimately resold to an unrelated party.

On December 31, 1977, petitioner acquired all of Financial's stock in CBN (281,164 shares) in exchange for real estate valued at $473,111.

Respondent determined that petitioner's acquisitions of CBN stock from Capitol and Financial were distributions in redemption of petitioner's stock under section 304(a)(1). Further, to the extent that such distributions exceeded the balance in petitioner's stockholders' surplus account, such distributions were from petitioner's policyholders' surplus account, resulting in phase III taxable income to petitioner under section 802(b)(3).

## Bad Debt Deduction

Petitioner sold life insurance policies through the use of sales agents working on a commission basis. Commissions were not earned by sales agents until premiums were paid by purchasers to petitioner. However, petitioner advanced commissions to sales agents upon the sale of policies but before premiums were actually paid. In some cases, petitioner would advance funds to group sales agents even before any sale took place. Petitioner recorded an advance by charging an account receivable from the sales agent receiving the advance. As premiums were paid by purchasers, the commission earned would be credited against the advance, thereby reducing the account receivable balance. Where petitioner returned premiums to a purchaser on a terminated sale, a charge back would be made to a sales agent's account in the amount of the commission previously credited.

Mr. Michael Houser was employed by petitioner from May 1973 through June 1977. He was director of marketing until May 1, 1974, when he became vice president of petitioner. In May or June of 1974, Mr. Houser was given the responsibility of attempting to collect outstanding sales agent accounts receivable balances shown on petitioner's books. His attempt to collect consisted of sending letters demanding payment to those agents for which he had an address and documentation in the company files to support such a demand. At trial, Mr. Houser could not identify the accounts for which he sent letters or why certain accounts were considered uncollectible. No legal action was taken, or

collection agency consulted, in order to collect the debts; no collections were made.

Petitioner claimed a $126,049.26 bad debt deduction on its 1973 Federal income tax return for worthless receivables from sales agents, which respondent disallowed upon examination of such return. A list presented by petitioner shows that this amount is made up of $76,465.22 in "ordinary agents balances," $11,762.71 in "group agents balances," and $37,821.33 in "agents deficiencies." No documentation was presented in support of the individual receivable balances. As best as we can tell, "ordinary agents" sold policies to individuals, while "group agents" sold to groups. The "agents deficiencies" list contains a large number of small balances purportedly due from agents selling small life policies in petitioner's former "industrial business," which was sold by petitioner in 1972 or 1973. The industrial business was essentially made up of door-to-door sales and collections of small life policies and premiums, respectively.

The ordinary agents balances include $19,600 due from the "Teamsters Union" and $10,247.10 from the "Union Trust Agency." These balances purportedly represent amounts due from the Teamsters Local 327 in Nashville, Tennessee. Many of petitioner's witnesses were asked (by deposition or at trial) about such balances, including Mr. Houser, Mr. Jerry Wayne Fickes, a consultant to petitioner, Mr. Robert B. Smith III, petitioner's former president, Mr. Curtis F. Mansfield, petitioner's former treasurer, and Mr. Billy Jack Goodrich, petitioner's former general counsel. None of these witnesses could explain why these funds were advanced to the Teamsters, whether any attempt was made to collect the balances due, or why the amounts were considered uncollectible. As to other accounts, petitioner's witnesses could identify the names of only a few of the debtors.

OPINION

### Stock Transactions

The first issue for decision is whether petitioner's acquisitions from Financial and Capitol of 56.32 percent and 20 percent, respectively, of their stock in CBN should be

treated as distributions in redemption of petitioner's stock under section 304(a)(1). If so, we must decide whether petitioner, as a life insurance company, made distributions under section 815, resulting in phase III taxable income under section 802(b)(3) to the extent made out of its policyholders' surplus account.

Section 304(a)(1) provides that, under certain circumstances, the acquisition by a corporate taxpayer from a controlling person of stock in another controlled corporation is to be treated as a distribution in redemption of the acquiring corporation's stock. See *Gunther v. Commissioner,* 92 T.C. 39 (1989). In order for section 304(a)(1) to require this result, both of two conditions must be present. First, one or more "persons" (sec. 7701(a)(1)[2]) must have been in "control" of the two corporations. Sec. 304(a)(1)(A). Second, one of the corporations, in exchange for "property" (sec. 317(a)[3]), must have acquired stock in the other corporation from the person so in control. Sec. 304(a)(1)(B).

"Control" is defined in section 304(c)(1) as the ownership of stock possessing at least 50 percent of the total combined voting power of all classes of stock entitled to vote, or at least 50 percent of the total value of shares of all classes of stock. Section 304(c)(3) expressly provides that the section 318(a) attribution rules relating to the constructive ownership of stock apply in determining whether control is present.

Petitioner argues that section 304(a)(1) is not applicable because it applies only where the controlling person is an individual, and not a corporation. Petitioner reasons that a controlling person cannot be a corporation because any dividend treatment that may result after applying section 304(a)(1) would be offset by the dividends received deduction of section 243. Without more, we simply inform petitioner that the term "person" (as used in section

---

[2]SEC. 7701. DEFINITIONS.

(a) When used in this title [26 U.S.C.], where not otherwise distinctly expressed or manifestly incompatible with the intent thereof—

(1) PERSON.—The term "person" shall be construed to mean and include an individual, a trust, estate, partnership, association, company or corporation.

[3]SEC. 317. OTHER DEFINITIONS.

(a) PROPERTY.—For purposes of this part [I of Subchapter C], the term "property" means money, securities, and any other property; except that such term does not include stock in the corporation making the distribution (or rights to acquire such stock).

304(a)(1)) is defined in section 7701(a)(1) as including corporations.

We first apply section 304(a)(1) to petitioner's acquisition of Financial's stock in CBN. Financial directly owned 100 percent of petitioner's stock and 56.32 percent of CBN's stock prior to Financial's sale of all of its stock in CBN to petitioner. Thus, Financial controlled both petitioner and CBN within the meaning of section 304(c)(1), thereby satisfying the first condition set forth in section 304(a)(1)(A). Further, petitioner, in return for property (real estate), acquired the stock of CBN from Financial, the person in control of both corporations, thereby satisfying the second condition set forth in section 304(a)(1)(B). Accordingly, petitioner's acquisition of CBN stock from Financial is to be treated as a distribution in redemption of petitioner's stock under section 304(a)(1).

Next, we apply section 304(a)(1) to petitioner's acquisition of Capitol's stock in CBN. Capitol transferred all of its stock in CBN to petitioner at the closing of the sale of all of Financial's stock in Capitol to Mr. Garner and the ten other individual purchasers (as unrelated third parties). Petitioner contends that section 304 does not apply because Financial was not in control of Capitol at the time of the sale of Capitol's stock in CBN to petitioner, so that the section 304(a)(1)(A) requirement would not be satisfied. We disagree.

The Purchase Agreement expressly conditions the sale of Financial's stock in Capitol on the sale of Capitol's stock in CBN to Financial "prior to closing." The Closing Agreement states that it is "Pursuant to and as a part of the Purchase Agreement," and that it "shall in no way be construed as superceding or altering any of the terms or conditions of the * * * Purchase Agreement, unless specifically so stated." Article V of the Closing Agreement specifically provides for the sale of Capitol's stock in CBN to petitioner, instead of to Financial as originally provided in the Purchase Agreement.

Remaining true to the language in the Closing Agreement, we look to the terms and conditions of the Purchase Agreement unless the Closing Agreement specifically provides otherwise. Article V of the Closing Agreement does not speak to when Capitol's sale of its stock in CBN was to

be closed, but the Purchase Agreement does provide that it occur prior to the closing of the sale of Financial's stock in Capitol. Accordingly, we conclude that Financial controlled Capitol at the time Capitol sold its stock in CBN to petitioner. See sec. 1.304-2(a), Income Tax Regs.

However, for section 304(a)(1) to apply, Capitol must control, directly or constructively, both petitioner and CBN. Sec. 304(a)(1)(A). Capitol directly owned no stock in petitioner and only 20 percent of CBN. However, under section 304(c)(3) we apply the constructive ownership rules of section 318(a) in determining control, except that we disregard the 50-percent limitations of sections 318(a)(2)(C) and 318(a)(3)(C). Section 318(a)(3)(C), after disregarding the 50-percent limitation, provides that if a corporation is owned, directly or indirectly, by or for any person, such corporation shall be considered as owning the stock owned, directly or indirectly, by or for such person. In other words, a corporation constructively owns stock owned by its parent. As applied to this case, Capitol constructively owned the stock owned by Financial. Accordingly, Capitol constructively owned 100 percent of petitioner, and owned a total of 76.32 percent, directly and constructively, of CBN. Section 304(a)(1)(A) is satisfied since Capitol thus controls both petitioner and CBN.

Section 304(a)(1)(B) is also satisfied since petitioner purchased Capitol's 20-percent (direct) stock ownership in CBN with property (assigned mortgages and a note). Since both section 304(a)(1) requirements have been met, petitioner's acquisition of CBN stock from Capitol is to be treated as a distribution in redemption of petitioner's stock under section 304(a)(1).

The tax consequences of a section 304(a)(1) redemption are governed by section 302 (except for distributions in redemption of stock to pay death taxes which are governed by section 303). Section 302(a) provides that if a redemption of stock meets any of the tests provided in section 302(b), the redemption shall be treated as a distribution in exchange for stock. If none of the section 302(b) tests are met, then section 302(d) applies to treat the redemption as a distribution under section 301. Under section 301, the distribution is to be treated as ordinary income to the extent of the

distributing corporation's earnings and profits. Sec. 301(c); sec. 316(a).

However, we need not decide whether any of the section 302(b) tests have been satisfied in this case. The tax consequences of a redemption are typically thought of in terms of whether the distribution is to be treated as an exchange for stock or as a dividend to the shareholder of the redeeming corporation. The petitioning taxpayer in this case is the redeeming corporation after applying section 304. A redemption generally has no immediate effect on a redeeming corporation's taxable income, but this case is peculiar because petitioner is a life insurance company governed by part I of subchapter L (secs. 801 through 820) of the Internal Revenue Code.[4]

Basically, these provisions establish a three-phase approach for determining a life insurance company's taxable income. Sec. 802(b); see *North Central Life Insurance Co. v. Commissioner*, 92 T.C. 254 (1989). Phase I income is the lesser of: (1) The company's share of investment income; or (2) gain (or loss) from operations. Sec. 802(b)(1). Simply put, the company's share of investment income consists of net earnings resulting from investments in excess of any investment earnings allocated to policyholders. Sec. 804. The gain from operations consists essentially of the company's share of investment income, insurance premiums, decreases in reserves and net capital gains, less statutory deductions. Secs. 809(b) through (e). Phase II income is 50 percent of the amount by which the gain from operations exceeds investment income. Sec. 802(b)(2). This amount is then added to the company's "shareholders' surplus account." Sec. 815(b)(2). The other half of this excess is added to the "policyholders' surplus account" and is not taxed as phase III income until it is distributed to, or specifically reserved for, the company's shareholders. Sec. 802(b)(3); sec. 815.

Under section 815(a), any distribution to shareholders is treated as being made first out of the shareholders' surplus account, and no tax is imposed on the company with

---

[4] The Deficit Reduction Act of 1984 substantially changed the Federal income taxation of life insurance companies for tax years beginning after Dec. 31, 1983. See sec. 211 et seq., Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 720. These changes generally do not apply to the years at issue in this case.

respect to the distribution. Sec. 815(a)(1); sec. 815(b). Once the shareholders' surplus account has been reduced to zero, any distribution is then treated as being made out of the policyholders' surplus account, and is taxed to the company as phase III income under section 802(b)(3). Sec. 815(a)(2); sec. 815(c). Finally, any distribution in excess of the balances of the shareholders' and policyholders' surplus accounts is treated as being made out of "other accounts," which results in no tax to the company. Sec. 815(a)(3); sec. 1.815-5, Income Tax Regs.

Section 815(f) defines the term "distribution" as including "any distribution in redemption of stock * * * ." The pertinent regulation provides by way of example that:

there is a distribution within the meaning of this paragraph in any case in which a corporation acquires the stock of a shareholder in exchange for property in a redemption treated as a distribution in exchange for stock under section 302(a) *or* treated as a distribution of property under section 302(d). * * * [Sec. 1.815-2(c)(1), Income Tax Regs. Emphasis added.]

This regulation repeats virtually identical language in both the House and Senate Committee Reports to the Life Insurance Company Income Tax Act of 1959, Pub. L. 86-69, 73 Stat. 112. H. Rept. No. 34, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 736, 761-762; S. Rept. 291, 86th Cong., 1st Sess. (1959), 1959-2 C.B. 770, 816. In *Imperial General Life Insurance Co. v. Commissioner,* 60 T.C. 979 (1973), we stated:

The term "distribution to shareholders" has a very broad meaning. Subchapter L permits deferral of tax on gain from operations only so long as such gains remain in the policyholders surplus account. When the shareholders withdraw such gains in any manner the tax must be paid. It does not matter whether the withdrawal takes the form of a declared dividend, a stock redemption, or a partial liquidation. In each such case, the distributing corporation has demonstrated that it does not regard retention of the amounts in question as required for policyholder protection. * * * [*Imperial General Life Insurance Co. v. Commissioner, supra* at 985.]

Thus, any stock redemption is a distribution to shareholders within the meaning of section 815, whether or not it is treated as a dividend under section 302(d). Petitioner argued that there was no dividend in this case. However, as mentioned above, we need not decide whether the redemp-

tions in this case are to be treated as a dividend or as an exchange under section 302.

The net result of applying section 304(a)(1) to both of petitioner's acquisitions of CBN stock is to recast the transactions as distributions in redemption of petitioner's own stock. However, petitioner contends that a constructive distribution in redemption under section 304 does not result in a distribution for purposes of section 815. Rather, petitioner seems to argue that an *actual* distribution in redemption to an *actual* stockholder is required for there to be a distribution under section 815. Respondent disagrees.

We had occasion to consider the interplay between sections 304(a)(2) and 815 in *Union Bankers Insurance Co. v. Commissioner,* 64 T.C. 807 (1975). While section 304(a)(1) is commonly referred to as governing "brother-sister" stock transactions (like the case at bar), section 304(a)(2) governs "parent-subsidiary" transactions. Very simply, section 304(a)(2) treats a corporation's purchase of a controlling corporation's stock from a shareholder of the controlling corporation as a distribution in redemption of the controlling corporation's stock.

In *Union Bankers,* a subsidiary corporation purchased shares of its parent corporation, Union Bankers Insurance Co., from a corporation which was controlling shareholder of the parent. Both the subsidiary and the parent were life insurance companies. After applying section 304(a)(2), we held that: (1) The subsidiary made a constructive dividend to the parent to the extent of the *subsidiary's earnings and profits;* and (2) the parent made a constructive distribution to its controlling shareholder in redemption of the parent's stock. 64 T.C. at 823. We held further that both the constructive dividend from the subsidiary to the parent and the parent's constructive distribution in redemption of *its* stock were distributions within the meaning of section 815, resulting in phase III taxable income to the distributors to the extent made out of policyholders' surplus. 64 T.C. at 830-831.

In *Webb v. Commissioner,* 67 T.C. 293, 309 (1976), affd. per curiam 572 F.2d 135 (5th Cir. 1978), we held that "we shall no longer follow the reasoning of either *Union Bankers* or *Broadview Lumber Co. v. United States,* an unreported

case (N.D. Ind. 1975, 36 AFTR 2d 75-6367, 75-2 USTC par. 9832), insofar as they hold that, in a situation described in section 304(a)(2) and (b)(2)(B), the 'issuing' or parent corporation realizes a taxable dividend." Accord *Virginia Materials Corp. v. Commissioner*, 67 T.C. 372, 377-379 (1976), affd. without published opinion 577 F.2d 739 (4th Cir. 1978). This decision was grounded in section 304(b)(2)(B) which provides that "the determination of the amount which is a dividend shall be made *as if* the property were distributed by the acquiring [subsidiary] corporation to the issuing [parent] corporation and immediately thereafter distributed by the issuing corporation [to its controlling shareholder(s)]." (Emphasis added.) The purpose of section 304(b)(2)(B) is simply to increase the earnings and profits of the issuing corporation to prevent the avoidance of dividend treatment by the selling shareholder(s). 67 T.C. at 305. The Seventh Circuit Court of Appeals later reversed the District Court decision in *Broadview Lumber* on this issue, agreeing with our decision in *Webb*. *Broadview Lumber Co. v. United States*, 561 F.2d 698 (7th Cir. 1977).

Neither *Webb, Virginia Materials,* or *Broadview Lumber* involved life insurance companies and consequently the interplay between sections 304 and 815. We made this point clear in *Webb* as follows:

The case of *Union Bankers Insurance Co.* * * * involved a substantially different factual situation and a different set of related statutes. In that case all the parties, the parent and subsidiary corporations as well as the redeeming shareholder, were corporations, and there was no determination of personal holding company tax liability. Nor was section 303 involved. The issue there presented required the meshing of section 304 with another set of directions in section 815 on how distributions to shareholders are to be charged in computing the phase III tax of life insurance companies. That case must be read in the context of the language and purposes of section 815. * * * [*Webb v. Commissioner, supra* at 309.]

In her dissenting opinion in *Webb,* Judge Scott questioned the continued vitality of the holding in *Union Bankers* that there was a distribution from the subsidiary to the parent within the meaning of section 815. See *Webb v. Commissioner, supra* at 314-315 (Scott, J., dissenting). Despite petitioner's argument to the contrary, we need not face this question in the instant case.

Neither *Webb, Virginia Materials,* or *Broadview Lumber* called into question the validity of the holding in *Union Bankers* that a constructive distribution under section 304(a)(2) from the parent to the controlling shareholder constituted a distribution to shareholders within the meaning of section 815. In this case, petitioner is on equal footing with the parent (*not* the subsidiary) corporation in *Union Bankers,* since both were "redeeming" corporations after applying sections 304(a)(1) and (a)(2), respectively. Under both sections 304(a)(1) and (a)(2), a constructive distribution in redemption by a redeeming corporation results in a distribution under section 815.[5]

Further, we reject petitioner's argument that a distribution under section 815 can only be to an actual stockholder. The application of the section 318(a) attribution rules in the context of section 304(a)(1) may result in a controlling person other than an actual stockholder of the redeeming (acquiring) corporation. Indeed, after applying these sections to petitioner's acquisition of Capitol's stock in CBN, Capitol is treated as controlling petitioner, even though Capitol actually owns no stock in petitioner. However, the fact that Capitol does not actually own stock in petitioner, and may

---

[5]We note that the Deficit Reduction Act of 1984 amended sec. 815 to expressly provide that a distribution from policyholders' surplus includes both "direct and indirect distributions" to shareholders. Sec. 211, Deficit Reduction Act of 1984, Pub. L. 98-369, 98 Stat. 494, 747.

The House Committee Report on this amendment provides in relevant part:

The bill provides that any direct or indirect distribution to shareholders from an existing policyholders surplus account of a stock life insurance company will be subject to tax at the corporate rate in the taxable year of the distribution. For these purposes, the term distribution is intended to include actual and constructive distributions. See *Union Bankers Insurance Co.,* 64 T.C. 807 (1975). * * * [H. Rept. 432, 98th Cong., 1st Sess. (1983) at 114.]

The Report of the Joint Committee on Taxation repeats this language and provides further:

The statutory emphasis on taxing both direct and indirect distributions from the policyholders surplus account was intended to be construed broadly, whether or not there is a distribution specifically within the meaning of section 301 or 302. There would be a direct distribution from the policyholders surplus account whenever there is a distribution to shareholders within the meaning of section 301 or 302. There would be an indirect distribution therefrom whenever policyholders surplus account funds are used to benefit the shareholders indirectly (for example, by having the stock life insurance company purchase the parent's stock either from the parent or a shareholder of the parent, or by having the company make loans to the parent whether or not for adequate consideration). * * * [Joint Committee on Taxation, 98th Cong., 2d Sess., General Explanation of the Revenue Provisions of the Deficit Reduction Act of 1984 594 (1984).]

This amendment applies only to taxable years beginning after Dec. 31, 1983, and thus clearly has no direct application to the case at bar. However, insofar as we follow the holding in *Union Bankers* that a distribution under sec. 815 may be actual or constructive, this amendment and legislative history seems to indicate later Congressional approval of such holding.

not in fact exercise control over petitioner, does not affect the applicability of section 304(a)(1). See *Coyle v. United States,* 415 F.2d 488, 490 (4th Cir. 1968), revg. 268 F. Supp. 233 (S.D. W.Va. 1967); *Fehrs Finance Co. v. Commissioner,* 58 T.C. 174, 187 (1972), affd. 487 F.2d 184 (8th Cir. 1973), cert. denied 416 U.S. 938 (1974); *Niedermeyer v. Commissioner,* 62 T.C. 280, 285 (1974), affd. 535 F.2d 500 (9th Cir. 1976), cert. denied 429 U.S. 1000 (1976); Rev. Rul. 70-496, 1970-2 C.B. 74. We see no reason to treat a distribution in redemption under section 304(a)(1) differently for life insurance companies than for other corporations.

Accordingly, we hold that petitioner's acquisitions from Financial and Capitol of 56.32 percent and 20 percent, respectively, of their stock in CBN are to be treated as distributions in redemption of petitioner's stock under section 304(a)(1). We hold further that such distributions in redemption were also distributions within the meaning of section 815, resulting in phase III taxable income to petitioner under section 302(b)(3) to the extent made out of policyholders' surplus.

## Bad Debt Deduction

The second and final issue for decision is whether petitioner is entitled to an operations loss carryover deduction in 1976 attributable to $126,049.26 in bad debts.

Petitioner originally claimed this amount as a bad debt deduction on its 1973 return, which was disallowed by respondent upon examination of such return. Petitioner now contends that the receivable balances making up the bad debt deduction became worthless in 1974, or, alternatively, in some later year. In contrast, respondent contends that petitioner has failed to show that the balances became worthless in 1974 or in any other year.

A life insurance company is allowed to deduct an operations loss carryback or carryover in a taxable year to the extent it reduces life insurance company taxable income (computed without regard to section 802(b)(3)) for such year to zero. Sec. 812; sec. 809(d)(4). In general, a loss from operations for any taxable year is carried back to each of the 3 preceding taxable years and is carried over to each of the 5 following taxable years. Sec. 812(b)(1).

Under section 809(d), a life insurance company is allowed certain specified deductions in computing its gain or loss from operations (sections 809(b)(1) and (b)(2)). Section 809(d)(11) provides that, subject to certain modifications provided in section 809(e), a life insurance company shall be allowed all other deductions allowed under subtitle A for purposes of computing taxable income to the extent not allowed as deductions in computing "investment yield" under section 804. Section 809(e)(2) provides that the reserve method for computing bad debts under section 166(c) shall not apply. Section 804(c)(5)(B) provides that in computing investment yield, no trade or business deduction shall be allowed to the extent attributable to the carrying on of the insurance business. The claimed bad debt deductions in this case were attributable to the insurance business, and (if allowed) are thus deductible in computing gain or loss from operations.

Section 166(a) provides that there shall be allowed as a deduction any debt which becomes wholly or partially worthless within the taxable year. The amount of the deduction is limited to the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. Sec. 166(b). The taxpayer bears the burden of proving entitlement to a claimed bad debt deduction. *Crown v. Commissioner*, 77 T.C. 582, 598 (1981); Rule 142(a), Tax Court Rules of Practice and Procedure.

The indebtedness must be bona fide and in a proven amount. *Holderness v. Commissioner*, T.C. Memo. 1977-5, affd. per curiam 615 F.2d 401 (6th Cir. 1980); sec. 1.166-1(c), Income Tax Regs. The determination of whether and when a debt is worthless is a question of fact. *Dallmeyer v. Commissioner*, 14 T.C. 1282, 1291 (1950). However, it is generally accepted that the year of worthlessness is to be fixed by identifiable events which form the basis of reasonable grounds for abandoning any hope of recovery. *Crown v. Commissioner, supra* at 598.

We conclude that petitioner has failed to prove the year in which the indebtedness became worthless. See *Cole v. Commissioner*, 871 F.2d 64 (7th Cir. 1989), affg. T.C. Memo. 1987-228. Mr. Houser testified that he sent letters in 1974 demanding payment to those listed debtors he could locate.

However, he could not, through documentation or testimony, sufficiently show what efforts were taken as to specific debtors. Also, petitioner took no legal action, nor used a collection agency, to collect any of the balances. A taxpayer does not have to take legal action to enforce payment in order to show a debt is worthless and uncollectible where a judgment would in all probability not result in satisfaction upon execution. Sec. 1.166-2(b), Income Tax Regs. However, petitioner has also failed to prove that any individual debtors were insolvent or otherwise judgment-proof. Finally, petitioner contends generally that the cost of legal action was not justified in the circumstances. While this explanation may be plausible as to some of the relatively small balances, we find it inadequate as to the larger amounts.

Accordingly, we hold that petitioner is not entitled to an operations loss carryover deduction in 1976 attributable to a $126,049.26 bad deduction originally claimed on petitioner's 1973 Federal income tax return.

To reflect the foregoing,

*Decisions will be entered under Rule 155.*